THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES ALLEN, Defendant-Appellant.

First District (2nd Division)   No. 1—85—2566

Opinion filed May 23, 1989.

Steven Clark and Sue Augustus, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Judy L. Groeneveld, and Douglas Bank, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

After being indicted for conspiracy and solicitation to commit murder, and murder, defendant James Allen was convicted of the conspiracy and murder charges and was sentenced to natural life imprisonment.

Defendant raises the following issues on appeal: (1) whether the

trial court committed reversible error in allowing him only seven peremptory challenges, instead of 14, after he had waived a jury for the death penalty sentencing phase of the trial; (2) whether the trial court erred in denying his motion for a *Franks* hearing after defendant had made a substantial preliminary showing that the affiant knowingly made a false statement in the affidavit for a warrant; (3) whether he was denied a fair trial because of the court's improper admission of other crimes evidence; (4) whether it was improper to deny defense counsel's motion to withdraw at sentencing and to refuse to appoint other counsel after defendant had filed, *pro se*, a motion for a new trial alleging ineffective assistance of counsel; and (5) whether defendant's conviction and sentence for conspiracy must be vacated in view of his having been convicted of the principal offense.

Defendant was indicted together with Charles Ashley and Henry Griffin on the above-mentioned charges. Before trial, defendant made a motion to quash arrest and suppress certain statements, alleging the improper issuance of a search warrant, and requested a *Franks* hearing to determine the veracity of the affiant. The trial court denied defendant a hearing on the motion and ordered that the trials of the three defendants would proceed simultaneously, although separately: two juries were selected to try Griffin and the defendant herein, while Ashley elected to be tried by the judge. Prior to jury selection, defendant waived a jury for the death sentencing phase of the proceeding, in connection with which the court ruled that the defendant was entitled to only seven peremptory challenges. The jury found him guilty of murder and conspiracy, and the judge sentenced him to natural life in prison. Defendant now appeals his conviction and sentence.

Three assistant State's Attorneys and six defense counsel participated in the trial, which was conducted before a judge and two juries in the same courtroom. The testimony of the witnesses established the following.

Neil Cohen, an assistant State's Attorney, took part in Operation Camelot, a coordinated effort to investigate the drug dealings of Charles Ashley, a major drug dealer on Chicago's south side. In furtherance of this investigation, the State's Attorney's office had a number of grand jury subpoenas served on individuals who frequented the area where Ashley's drug operation was extant. The Chicago police department also executed a number of search warrants and two arrest warrants—one for Ashley and one for Carl Gibson—on June 14, 1984. After Cohen learned on June 21, 1984, that Gibson had been slain, he met with Sherman Overstreet, who then agreed to testify against Ashley.

John Blackman, a Chicago police officer, discovered Gibson's body on the 73rd Street exit ramp of the Chicago Skyway on June 21, 1984. It was stipulated that Gibson died of multiple gunshot wounds.

Overstreet admitted that he was convicted of murder and of retail theft, that he had multiple charges of delivery of heroin pending against him, and that in exchange for his testimony at trial and for pleading guilty to one of the pending charges, he was sentenced to time served and was relocated. On June 21, 1984, Overstreet was living in an apartment building owned by Ashley, for whom he had worked for the previous nine years as a drug runner, delivering heroin and cocaine. Overstreet knew defendant as being from the area of 65th and Ashland and had seen him with Ashley a few times. On June 10, 1985, Overstreet was living in witness quarters, where he had a conversation with defendant in which defendant told Overstreet that he was first offered a "contract" by Ashley, but when he refused it, Griffin accepted it. Defendant further told Overstreet that he drove the murder car and that he was supposed to have obtained the murder weapons. Defendant and Griffin picked Gibson up at 64th and Maryland, drove to 75th Street, and while defendant waited in the car, Griffin and Gibson went into an apartment. When they returned to the car, Griffin got in the back seat and Gibson got in the front passenger seat. Defendant then began driving southbound on the Skyway, but at the 98th Street toll plaza, he turned the car around and began heading north. At this point, Griffin shot Gibson four times. Defendant left the Skyway at the 73rd Street exit, stopped the car on the exit ramp, jumped out of the car and ran home. Defendant also told Overstreet that he wore tight driving gloves so as not to leave any fingerprints, that he was part of the contract, and that he was angry because he did not receive payment for his participation in the murder.

Darryl Moore worked as an "enforcer" for Ashley for a number of years and knew defendant and Griffin. Moore admitted that he sold drugs, killed people for money, that he had previously been convicted of rape and two robberies, and had an armed robbery charge and a drug case pending against him. In exchange for his testimony, the armed robbery charge was reduced to robbery, for which he received time served; his drug case was dismissed, he was given a grant of immunity on a murder charge, and he was also relocated.

Moore met with Ashley in the latter's grocery store at 65th and Maryland, where Ashley asked him if he would kill Carl Gibson for $200 and three ounces of narcotics. Moore responded that he would do it for $10,000. When Ashley did not react, Moore lowered his price to $5,000, and after Ashley refused, Moore suggested that Griffin might

be interested.

On June 20, 1984, Griffin came to Moore's apartment and told Moore that he had a contract from Ashley on Gibson; he asked Moore if he would assist him and Moore refused. On June 21, 1984, Griffin and defendant came to Moore's apartment and there Griffin informed Moore that the contract on Gibson had been easy, that defendant drove the car and that he (Griffin) shot Gibson on the Skyway.

On June 29, 1984, defendant came to Moore's apartment, complaining that he had not been paid for the work he had done for Ashley. Defendant asked Moore if he would help kidnap Ashley and hold him for ransom. After Moore refused, defendant left with two other men who were at Moore's apartment. Moore also admitted that he knew Arthur Stringer, but he denied ever walking down the street with Stringer, seeing the defendant, pointing a finger at defendant and saying, "I'm going to get that nigger if it's the last thing I do."

On August 9, 1984, Moore was taken to the State's Attorney's office, where he made a tape-recorded phone call to Griffin in which the two discussed the disposal of the gun and the car used in the victim's murder. They also discussed how Griffin had been offered the contract and how he and the defendant carried it out. While they were talking, Assistant State's Attorney Cohen was listening on another phone, and police officers from the narcotics division were traveling to Griffin's apartment to arrest him. Griffin was found in the bathroom with the telephone in his hand; Cohen heard him being arrested over the phone.

Defendant and Griffin were both arrested on August 9, 1984, and placed in separate interview rooms. Cohen spoke first with defendant and later with Griffin. After defendant waived his *Miranda* rights, he informed Cohen that Griffin had approached him and had offered him money if he would help lure someone out of a building to be killed, but that he refused Griffin's offer. Defendant admitted to Cohen that on June 20, he and Griffin drove to 93rd and Stony Island, where Griffin left the car to get the victim, Carl Gibson. When Griffin returned, defendant was in the driver's seat; Gibson got in the front seat and Griffin sat in the back.

Defendant related to Cohen that he drove onto the Skyway southbound but turned around at the toll plaza and went north. Before he exited at 73rd Street, defendant heard three or four shots and saw Gibson slump forward. He drove halfway down the exit ramp, stopped the car, and when he jumped out, Griffin got out and pointed a gun at him. Defendant ran away and went home. Defendant told Cohen that fear prevented him from going to the police.

On cross-examination, Cohen testified that the defendant had

stated that he did not know that Griffin was going to shoot Carl Gibson, that Ashley and Gibson forced him to put his fingerprints on a murder weapon later used to kill a man named "Doc" who ran a drug store in Ashley's neighborhood, and that Ashley threatened defendant and defendant's family, warning him not to incriminate Ashley in the Gibson murder.

For the defense, Arthur Stringer, after acknowledging that he had been convicted of armed robbery and murder and was currently imprisoned for a parole violation, testified that in mid-1983, he was with Moore when they saw defendant cross the street. Moore pointed at defendant and told Stringer that defendant had embarrassed him once and that he would get even with him if he had the chance. In August of 1984, Moore told Stringer that he had recently gotten out of jail and that defendant was supposed to get set up in the "Skyway murder" although defendant had no knowledge of it.

The jury returned guilty verdicts against the defendant on the conspiracy and murder charges. At the sentencing hearing, the court denied defendant's *pro se* motion for a new trial as well as the post-trial motion presented by his counsel. The trial judge also denied the State's request to sentence the defendant to death. Following arguments, the judge sentenced the defendant to natural life imprisonment on both the murder and conspiracy to commit murder convictions.

## I

Supreme Court Rule 434(d) provides in pertinent part as follows:

> "A defendant tried alone shall be allowed 14 peremptory challenges in a capital case, 7 in a case in which the punishment may be imprisonment in the penitentiary, and 5 in all other cases." (107 Ill. 2d R. 434(d).)

Defendant first claims that because he was a defendant tried alone in a capital case after the effective date of Supreme Court Rule 434(d), the trial court committed reversible error in allowing him only seven peremptory challenges, instead of 14, even though he waived a jury for the death penalty sentencing phase. Defendant further analogizes his case to those in which it has been held to be reversible error to deprive a party of his right to exercise all of the peremptory challenges to which he is entitled in the impaneling of a jury. *Gulf, Colorado & Santa Fe Ry. Co. v. Shane* (1895), 157 U.S. 348, 39 L. Ed. 727, 15 S. Ct. 641; *People v. Webster* (1935), 362 Ill. 226, 198 N.E. 322.

■ We encounter no difficulty in holding that *People v. Wolfe* (1986), 144 Ill. App. 3d 843, 494 N.E.2d 670, is controlling here. In *Wolfe*, two defendants were jointly tried in a capital case, and, as

defendant did in the case at bar, prior to trial, they waived a jury for the death penalty hearing. The trial court accordingly allowed each of the defendants only six peremptory challenges, the statutory number allowed at the time in a single trial of two defendants "in a case in which the punishment may be imprisonment in the penitentiary." (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(e).) The statute also provided each defendant 12 peremptory challenges in a capital case. The court in *Wolfe*, relying on *People v. Nathaniel* (1981), 103 Ill. App. 3d 610, 431 N.E.2d 1080, reasoned that inasmuch as it was no longer within the province of the jury to sentence the defendant to capital punishment, "the rationale behind the statute granting a greater number of peremptory challenges in a capital case simply does not apply." *Wolfe*, 144 Ill. App. 3d at 851.

Defendant insists, however, that *Wolfe* was incorrectly decided for the very reason that it based its support on *People v. Nathaniel* (103 Ill. App. 3d 610, 451 N.E.2d 1080). In *Nathaniel*, the State was uncertain whether the facts of the case qualified it for a sentence of death, and if it did, whether such a penalty would be sought. Consequently, the State requested that the *voir dire* be conducted under the guidelines of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, but when the trial judge refused to do so, the State did not pursue the issue any further. Although it did not "wholly approve of his procedure" (103 Ill. App. 3d at 615), the appellate court held that since the trial court's decision not to "*Witherspoon*" the jury eliminated the possibility that the defendant could receive the death penalty, the matter was not a capital case within the meaning of the statute. Furthermore, the defendant argues, both in *Wolfe* and in the present case, the jury was being selected to determine the guilt or the innocence of an accused against whom the prosecution could and would seek the death penalty, and even though the jury would not decide whether to impose it, the jury did decide the equally important question of whether the defendant had been guilty of the crime which might warrant the imposition of such a penalty.

Defendant also makes the point that neither Supreme Court Rule 434(d), nor its predecessor statute conditions the defendant's right to the specified number of peremptory challenges in a capital case on whether or not the defendant elects a jury for the death penalty hearing; rather, the defendant contends, the rule and the former statute make a distinction only between capital offenses and those punishable by imprisonment in the penitentiary. The defendant concludes with the argument that if capital punishment is threatened upon conviction, the case is a "capital" one under a sensible construction of the term as

used in the former statute and the present rule. *People v. Holmes* (1974), 19 Ill. App. 3d 814, 313 N.E.2d 297.

We deem it to be the sheerest form of tautology, yet necessary, to point out that because defendant waived a jury for the death penalty hearing, this was no longer a capital case insofar as the jury was concerned. By any logical interpretation of the terms of Rule 434(d), the number of peremptory challenges allowed to a defendant is unmistakably related to the punishment the *jury* metes out to him. But here the jury was in no conceivable way involved in determining his punishment, which was by his own request left solely to the judge, and the jury was so informed from the very beginning of the trial. To suggest, as defendant does, that the punishment the trial judge imposes is in some impenetrably obscure way dependent upon the number of peremptory challenges a defendant is allotted under the rule is plainly an absurdity.

Defendant seems also to be propounding to us that a jury divorced from the duty of fixing a sentence is somehow foreclosed from, or at least less prone to, return a guilty verdict in a murder case if he is permitted 14 peremptory challenges as opposed to seven, although he neglects to inform us as to where he finds this gloss. The fact that Rule 434(d) does not contain specific language conditioning the defendant's right to the specified number of peremptory challenges in a capital case on whether or not the defendant elects a jury for the death penalty hearing does not render *Wolfe* invalid, for the rationale of the case is implicit and inherent in the rule. Accordingly, we hold that the trial court committed no error in allowing defendant seven, instead of 14, peremptory challenges after he had waived a jury for the death penalty sentencing phase of defendant's trial.

## II

As to his second issue, defendant argues that the trial court erred in denying his motion for a *Franks* hearing, in support of which he claims to have made a substantial preliminary showing that Detective Pochardo knowingly made a false statement in his affidavit for both the search warrant and the arrest warrant, which were issued by separate judges.

Defendant asserts that pursuant to *Franks v. Delaware* (1978), 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674, and *People v. Garcia* (1982), 109 Ill. App. 3d 142, 440 N.E.2d 269, *cert. denied* (1983), 460 U.S. 1040, 75 L. Ed. 2d 792, 103 S. Ct. 1433, the fourth amendment requires that a hearing be held at the defendant's request if he makes a preliminary showing that a false statement knowingly

and intentionally, or with reckless disregard for the truth, is alleged to have been included by the affiant in an affidavit for a search warrant and if the alleged false statement was necessary to the finding of probable cause.

Defendant contends that the affiant, Detective Pochardo, swore falsely when he deposed that an informant, Darryl Moore, had previously given him reliable information on 10 separate cases. Defendant maintains that Pochardo lied about the number of occasions he talked to Moore and that he falsely represented the facts of the case that were known to the police at the time. Defendant avers that he thus made the necessary preliminary showing which requires a hearing under *Franks* and *Garcia*.

Defendant further asserts that the *Franks* principle is equally applicable to an arrest warrant. (*People v. Hothersall* (1981), 103 Ill. App. 3d 183, 430 N.E.2d 1142.) The fact that the search warrant and arrest warrant were signed by different judges, he argues, is meaningless, for in both instances there is a question as to whether there was probable cause for their issuance. It is reasonable to infer, he adds, that Detective Pochardo supplied the judge who signed the arrest warrant with some of the same information contained in his complaint for the search warrant. Accordingly, defendant concludes that he was improperly denied the opportunity to show that since Detective Pochardo had obtained both warrants by the use of false allegations, this case should be remanded for a *Franks* hearing.

The State responds that the only reason for challenging an affidavit via a *Franks* hearing is to suppress any evidence obtained under the search warrant and to exclude its use at a trial, and since in the present case there was no evidence obtained as a result of the execution of the search warrant, there was nothing to suppress; therefore, there was no need to hold a *Franks* hearing. Moreover, the State contends, assuming *arguendo* that the search warrant was invalid, its taint in no way affected the issuance of the arrest warrant. The search warrant turned up no evidence that was used in connection with the arrest warrant, and the defendant points to nothing that would indicate that the arrest warrant was premised or based upon the accompanying affidavit to the search warrant. Finally, the State argues that inasmuch as a *Franks* hearing applies only to determining the validity of a search warrant, a *Franks* hearing is of no relevance in an attack on an arrest warrant.

In light of the fact that the police did not recover any evidence from the search, we hold that it is irrelevant whether the search warrant was valid. Thus, the issue of the trial court's failure to suppress

evidence is moot, and although pursuant to *Hothersall*, the *Franks* principle is applicable in the case of a similar attack on an arrest warrant, in the case at bar, the defendant does not provide us with anything in the record to show that the judge who issued the warrant relied upon the questionable affidavit; he merely asks this court to *infer* that the detective told the judge who issued the arrest warrant at least some of the same things that he included in his affidavit for the search warrant. Since *Franks* is clear in its requirement that allegations of falsehood be accompanied by an offer of proof, it should go without saying that inferences are not acceptable substitutes. Consequently, the defendant was not entitled to a *Franks* hearing in regard to the arrest warrant.

### III

As to his third issue, defendant contends that he was denied a fair trial by reason of the admission of irrelevant other crimes evidence, charging (A) that the State deliberately elicited testimony that he participated in an armed robbery and kidnapping and was a suspect in an unrelated murder—more specifically, that defendant intended to kidnap and rob Ashley; (B) that defendant committed kidnappings of drug dealers for ransom; and (C) that defendant was a suspect in a murder unrelated to the one forming the subject matter of this case. He claims that such testimony was irrelevant, highly prejudicial and denied him a fair trial. We shall discuss these issues *seriatim*.

### A

■■■ Defendant complains that the testimony as to the plot to kidnap Ashley and hold him for ransom was not probative of the defendant's intent or knowledge of the conspiracy to murder Gibson, and that the testimony that he and Moore kidnapped other drug dealers for ransom had on relevance to any of the issues for which he was tired.

Although it is generally true that evidence of other crimes is inadmissible to prove a defendant's disposition to commit the crimes charged (*People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360; *People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821, *cert. denied* (1983), 464 U.S. 84, 78 L. Ed. 2d 136, 104 S. Ct. 145, citing *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; see also *People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666), evidence of past crimes may be admitted if it is relevant to prove any material fact in issue other than defendant's propensity to commit a crime, as long as there is a similarity between the other crimes and the offense with which

defendant is charged. (*People v. Evans*, 125 Ill. 2d 50, citing *People v. Taylor* (1984), 101 Ill. 2d 508, 463 N.E.2d 705, *cert. denied* (1984), 469 U.S. 866, 83 L. Ed. 2d 140, 105 S. Ct. 209.) More particularly, evidence which goes to show motive, intent, identity, knowledge, absence of mistake, accident, common scheme or plan or *modus operandi* may also be received even though it may show the commission of a separate offense. (*People v. Evans*, 125 Ill. 2d 50, citing *People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821; *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; *People v. Nicholson* (1978), 61 Ill. App. 3d 621, 377 N.E.2d 1063; *People v. Jordan* (1974), 18 Ill. App. 3d 133, 309 N.E.2d 274.) *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292, cites a variety of other instances in which evidence of the commission of other crimes or wrongful conduct has been found to be admissible and collects the authorities thereon. Such instances include, among others, evidence relevant to prove absence of an innocent frame of mind and consciousness of guilt. See *People v. Crayton* (1988), 175 Ill. App. 3d 932, 530 N.E.2d 651.

The State's theory at trial was that Ashley hired defendant and Griffin to kill Gibson, and when the defendant was not paid by Ashley for his part in the murder, the defendant planned to kidnap Ashley and hold him for ransom in order to collect the money that Ashley owed him, a theory amply borne out by the evidence set forth hereinabove. Indeed, defendant states in his brief filed in this court that "[w]hile the statement that he had not been paid for the murder was relevant to establish participation, the claim that he committed another crime for the supposed purpose of collecting the debt added nothing to the evidence of participation in the murder other than to improperly prejudice Mr. Allen with the taint of another crime." We disagree with the last part of this statement. Because the evidence complained of was all of one coherent piece, there was sufficient reason for the trial court to have held that since the evidence of the act and the evidence of the crime charged are inextricably intertwined, the act is not extrinsic and the rule relating to "other crimes" evidence is not implicated, simply because such evidence formed an integral and natural part of the witness' account of the circumstances surrounding the offenses for which defendant was indicted. *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.

## B

The State claims that its "use of evidence that defendant committed kidnappings of drug dealers for ransom was proper and relevant to show *modus operandi* to establish that defendant did, in fact,

intend to kidnap Ashley and hold him for ransom and that defendant did, in fact, kidnap and murder Gibson." The State adds that "this is true because the practice of kidnapping a drug dealer for ransom is unique enough to bring defendant's 'other crime' within the *modus operandi* exception to the general rule prohibiting admission of evidence of crimes other than the one charged."

Defendant responds that "[t]he *modus operandi* exception is used to establish the identity of the offender based on unique similar actions of a more specific nature than a particular class of victims as broad as drug dealers," and adds that "while no specifics were offered as to the prior kidnapping for ransom of drug dealers her, there still are several obvious differences from the crime in question since this was a murder with no ransom sought."

The court in *Kimbrough* defined *modus operandi* and discussed its application as follows:

> "*Modus operandi* means, literally, 'method of working.' It refers to a pattern of criminal behavior so distinct that separate crimes or wrongful conduct are recognized as the work of the same person. (*People v. Barbour* (1982), 106 Ill. App. 3d 993, 1000, 436 N.E.2d 667, 672.) If evidence of other crimes is offered to prove *modus operandi*, there must be some clear connection between the other crime and the crime charged which creates a logical inference that if defendant committed one of the acts, he may have committed the other act. This inference of identity does not arise from the mere fact that the crime charged and the other crime share certain common features or marks of similarity, for it may be that these similarities are shared not only by the crime charged and defendant's other crime, but also by numerous distinct crimes committed by persons other than the defendant. Rather, the inference is created when both crimes share peculiar and distinctive common features so as to earmark both crimes as the handiwork of the defendant. (*People v. Matthews* (1985), 137 Ill. App. 3d 870, 875-76.) There must be some distinctive features that are not common to most offenses of that type. (*People v. Dickerson* (1983), 119 Ill. App. 3d 568, 574, 456 N.E.2d 920, 925.)" *People v. Kimbrough*, 138 Ill. App. 3d at 486-87.

The rules developed by our courts governing the purposes for which extrinsic evidence of crimes, wrongs, or acts may be admitted do not extend to their being inappropriately pyramided or to a prosecutor's use of bootstrapping methods in invoking them. The State's having been permitted to introduce evidence of defendant's intent to

kidnap Ashley as his method of forcing Ashley to pay him for his participation in the murder of Gibson does not call for the creation of a "free-fire" zone allowing the admission of Moore's testimony that he and the defendant had engaged in "kidnapping drug dealers—we would kidnap for ransom." The State's theory at trial, we are compelled to reiterate, was that Ashley hired defendant and Griffin to *kill* Gibson in order to silence him because he was under an arrest warrant along with Ashley in connection with certain drug-related crimes of apparently great magnitude and that later defendant intended to kidnap Ashley to enforce payment of the promised fee. But it is quite another matter to contend that to that stratum of evidence there may be added another layer of testimony relating to other kidnappings, where kidnapping is not in issue, more particularly where the State advances *modus operandi* in support of its contention. The general kidnapping of drug dealers for ransom is clearly not congruent with killing for hire in order to keep the victim from testifying against his companion in crime, even though the companions are engaged in the drug traffic, even though the murderer later forms the intent to kidnap his procurer as a means of collecting the promised compensation, and even though such compensation is viewed as "ransom."

We note in the record, however, the following colloquy which took place during the disputed part of Moore's testimony:

"Q. How long had you been doing work with James Allen?

A. For a matter of weeks.

Q. And what type of work did you and Mr. Allen do together?

A. We was kidnapping drug dealers. He was—he would set it and me and a few other guys—

MR. KUNZ: Objection.

A. We would kidnap for ransom.

MR. KUNZ: Beyond the scope of this and the answer to discovery.

THE COURT: Overruled.

Q. You and Mr. Allen would kidnap drug dealers for ransom?

A. Yes.

Q. And would you be paid the ransom that you demanded?

THE COURT: All right, sustained."

It might be fairly inferred from the trial judge's having ultimately sustained the defense's objection that defendant's charge of error is not well taken. No matter, we hold that even if we were to assume that error occurred, it was harmless in light of the overwhelming evidence of guilt amassed against the defendant, as witness his admis-

sions as testified to by Overstreet, Moore, and Assistant State's Attorney Cohen.

## C

■ As to the murder of "Doc," since the defense was first to raise that subject, the defendant is precluded from successfully claiming that the State's response thereto was somehow unfair and improper. (*People v. Ford* (1987), 163 Ill. App. 3d 497, 516 N.E.2d 766.) The record is clear that the defense introduced evidence of "Doc's" murder in an attempt to explain that defendant "feared going to the police because Ashley was threatening to frame him for the murder" if he reported the matter to the authorities; hence the reason for Ashley's and Griffin's forcing him to put his fingerprints on a gun that was subsequently used to kill "Doc."

## IV

■ As his fourth issue, defendant asserts that since he alleged ineffective assistance of counsel because of his trial attorney's failure to call certain witnesses, it was erroneous for the court to deny the attorney's motion to withdraw at sentencing and to refuse to appoint other counsel to assist defendant in his *pro se* motion for a new trial, citing *People v. Krankel* (1984), 102 Ill. 2d 181, 464 N.E.2d 1045. In *Krankel,* defense counsel refused to present an alibi witness and failed to investigate defendant's whereabouts at the time of the offense. The defendant argued *pro se* his post-trial ineffective assistance of counsel motion. The appellate court ruled that the trial court should have appointed substitute counsel and remanded the cause for a hearing on the defendant's motion.

Defendant states that although *Krankel* does not establish a *per se* rule for the appointment of counsel, whenever a defendant files a *pro se* motion alleging ineffective assistance of counsel, the trial court should at least examine the merits of his claim. Defendant further states that *People v. Jackson* (1985), 131 Ill. App. 3d 128, 474 N.E.2d 466, sets forth the procedure for the trial court to follow when confronted with this issue: it should examine the factual matters underlying defendant's claim, and if it goes to matters of trial tactics or strategy, the claim should be declared spurious and the request for new counsel denied; if the factual matters show possible neglect of defendant's case, the court should appoint new counsel who would undertake an independent evaluation of defendant's claim. *Jackson,* 131 Ill. App. 3d at 138.

Defendant indicates that there was a rift between him and his

counsel and that there were witnesses whom his attorney did not call to testify. Defendant urges that inasmuch as the evidence against him was not overwhelming, and he faced the possibility of the death penalty, the trial court should have appointed independent counsel to argue the defendant's ineffective assistance of counsel claim.

We agree with the State that defense counsel's decision as to which witnesses to call was a matter of trial tactics and strategy, in which case a charge of ineffective assistance of counsel cannot prevail. (*People v. Carter* (1985), 132 Ill. App. 3d 523, 477 N.E.2d 1307.) Moreover, defendant failed to inform the trial court, as he overlooks doing here, as to who the witnesses might be whom his attorney is alleged to have neglected to call and what evidence they may have afforded the court. Besides, in *Krankel*, unlike the present case, the defendant's challenge obviously had merit, and thus justified the appointment of substitute counsel, whereas, here defendant's argument merely demonstrates that he disagreed with defense counsel's trial strategy, which is not enough to mandate the appointment of new counsel. *Jackson*, 131 Ill. App. 3d at 139.

## V

As his fifth and final issue, defendant argues, and the State concedes, that pursuant to section 8—5 of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 8—5), a defendant may not be convicted of both an inchoate offense and the principal one. *People v. Walker* (1981), 84 Ill. 2d 512, 419 N.E.2d 1167; *People v. Atkins* (1987), 161 Ill. App. 3d 600, 515 N.E.2d 272.

Accordingly, we hold that defendant's convictions for conspiracy to commit murder should be vacated; in all other respects, the judgment of the circuit court is affirmed.

Judgment vacated in part and affirmed.

EGAN* and HARTMAN, JJ., concur.

*Justice Egan participated in this opinion before being transferred to the sixth division.