THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRY GRAY, Defendant-Appellant.

First District (2nd Division) No. 1—87—3899

■■■■■■

Opinion filed June 18, 1991.

Randolph N. Stone, Public Defender, of Chicago (Bruce C. Landrum, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, James F. Fitzgerald, and Kathleen Howlett, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Defendant Terry Gray was convicted by a jury of murder and acquitted of aggravated criminal sexual assault; he appeals the murder conviction upon numerous grounds.

Detective Victor Breska testified that on March 25, 1986, he was riding in an unmarked police car when, at about 8:45 p.m., someone flagged him down at 13th and Troy Streets in Chicago, and upon pulling over, he was told that a body had been discovered behind a building in a nearby alley. Breska walked into the alley and saw a body lying in the basement stairwell of an abandoned three-flat building. There was blood on the deceased's upper torso and head, and the head was also partially covered with garbage. There was blood on the ground and wall as well, and bricks, glass and other sharp objects were lying around in the alley near the deceased. Although the evidence conflicted as to whether the pants of the deceased were pulled down, there seems to be agreement that they were unzipped. Breska also testified that all but two or three steps in the stairwell leading to the basement were covered with garbage, that the alley was below the middle of the basement door, and that a photograph taken at alley level did not disclose the body.

Detective Ed Rave testified that the area where the body was found had a high crime rate, with numerous incidents of narcotics use and homicide. On March 25, 1986, at 9 p.m., he proceeded to the rear of 1316 South Troy, and observed a body lying in the basement stairwell with clenched fists.

On cross-examination, Rave stated that although the area was dusted for fingerprints, none was found. The trial judge then sustained the State's objection and barred defendant from cross-examining Rave about information he had received during his investigation concerning threats to the deceased by a third party. Rave further testified that the nearest streetlight was 20 feet from the body and that there was a porch or platform directly above the basement door.

Calvin Polk, who lives on the second floor of 1255 South Troy, testified as a witness for the State that he spent the early evening of March 25, 1986, behind 1254 South Troy, drinking with his brothers James and Omar. At about 8:30 p.m., as the three were entering the alley, Calvin spoke to Sam Redmond, who was just leaving it. As Calvin and his brothers walked down the alley and behind one of the buildings, Calvin saw two people in the stairwell under the porch, one of whom was standing, and the other was lying on the ground. Because the porch blocked his view, he could see only the legs of the person lying on the ground, and he could not see the face of the person who was standing. However, he identified defendant based upon his body build. Calvin also stated that at about 9:35 p.m., he dialed 911, and at that point in his testimony the record reflects the following:

"Q. When you called 911, what did you tell them?

MR. HOWSE: Objection, your Honor.

A. I stated that there had been a murder committed and that the police were there investigating the scene.

Q. Okay. And did you tell them who they were looking for?

A. Yes, sir, I did.

Q. Who did you say that was?

A. I said Terry Gray."

During this conversation with the police, he also gave a description of defendant, including his clothing, body build, facial hair and age.

Over defendant's hearsay objection, Calvin stated that on April 12, 1986, he was interviewed at police headquarters, where at first he denied knowledge of the incident, but after being told of certain information obtained by the police, he told them of the phone call he had made and what he saw and had seen. Defendant renewed his objection, alleging that Calvin's testimony was a prior consistent statement used to bolster trial testimony. The judge overruled the objection. Calvin also testified over the defense's objection that on April 12, 1986, he picked out defendant's photograph at the police station.

On cross-examination, Calvin stated that it was dark by 8 p.m. on March 25, and the nearest light was 20 feet away, but that he had

known defendant for seven or eight years, saw him on the streets and occasionally shot pool with him. He further testified that he and his companions had been drinking whiskey and beer for an hour or two, that he never saw the suspect's hands or hair, that he could not determine if the person that he saw standing was black or white, and that he went back to the corner to drink intermittently for another two hours after seeing the body. After the police showed him photographs of the defendant and one Willie Barber, Calvin picked out defendant's picture as the man he saw.

Dr. Tae An, an assistant Cook County medical examiner, testified that the postmortem examination he performed on the deceased on March 26, 1986, disclosed several lacerations, bruises and facial fractures, and that he took swab samples of the deceased's vagina, rectum and mouth. He determined the cause of death to be multiple blunt and sharp facial injuries. A cutting wound appeared on the left wrist area, which he characterized as a defense wound. On cross-examination, the doctor stated that none of the fingernails on the deceased was broken, and there was no skin recovered from them.

Bruno Waltman, a dispatcher with the police department, testified that he received an anonymous call at about 10:34 p.m. on March 25, 1986. Over defendant's hearsay objection, Waltman further testified that the caller said that a murder had been committed in an alley near 13th and Kedzie and that defendant might be the offender.

Rick Roberts, a criminologist in the police department's crime lab, testified that in April of 1986, he examined the swabs obtained from the medical examiner's office and found the presence of sperm, which could have been present in the victim's body for up to 48 hours, but that his tests could not determine whether the presence of sperm indicated rape.

Ghanetta Simms, another State witness, testified that she had known defendant between 10 and 13 years and that at about 5 p.m. on March 18, 1986, one week before the murder of the deceased, the defendant grabbed her from behind as she walked down 13th Street near Troy. The defendant then started pulling her down an alley, the same alley in which the deceased was found, and stated that he wanted "some of her stuff." Simms struggled, broke loose and ran away.

Defendant objected to Simms' testimony as inadmissible evidence of prior bad acts. Although the State argued that the testimony was proper in order to show intent, motive and identity, the trial court overruled the objection, stating that Simms' testimony could be admitted to show common scheme and design. On cross-examination,

Simms testified that she never called the police to report the incident, and stated over defendant's objection that the reason she did not do so was because she was afraid of the defendant.

Omar McGhee, brother of Calvin Polk, testified that he knew the defendant as a friend of Calvin's and that he had seen the two shooting pool together four or five times since 1981. On March 25, 1986, at 8:30 p.m., he accompanied his brothers Calvin and James into the alley behind South Troy, where, from a distance of 10 to 12 feet, he saw defendant standing in the basement stairwell of an abandoned building. McGhee testified that he had four prior convictions for burglary and one for an attempted robbery, all in the 1970's.

Another State witness, Richard Bates, testified as follows: he lived and worked in the neighborhood of the murder, and had known both the defendant and the deceased for about 10 years. On March 25, 1986, at about 8 p.m., he was walking down the alley behind 1340 South Troy when he heard someone call out for help. He then turned around and saw the defendant and the deceased in the basement of a building, standing a foot apart. When Bates was about 12 feet away from the defendant and the deceased, the defendant threatened to shoot him if he did not go home. Over defendant's objection, Bates then testified that he later identified defendant from a photograph shown to him by the police. Although most of Bates' testimony on direct examination indicated that he saw the deceased, he stated on cross-examination that he never saw her, but could hear her voice. Bates stated on redirect that although he originally declined to pick defendant out of a lineup because he was afraid to become involved, after learning that others had come forward to testify against defendant, he identified him in a lineup and agreed to testify against him as well. The defense objected to this testimony on the ground that it was "improper rehabilitation."

During a conference in chambers, the trial judge overruled defendant's objection to the State's interrogating Detective Sherry about his search for the defendant. Sherry then testified that during the course of his investigation, he had received certain leads and had questioned defendant's mother, who told him that she had not seen defendant for five or six weeks. Sherry also stated that he tried to contact defendant five or six times.

On cross-examination, after Sherry testified that he had also received information regarding Willie Barber, the trial court sustained the State's objection to the defense's asking Sherry if he had learned that Barber had threatened the deceased. The trial court also sustained the State's objection when defense counsel asked Sherry about

his interview of Bates on March 25, 1986. On redirect, over defendant's objection, Sherry testified that Willie Barber appeared to be around 60 years old.

During the exhibit conference, over defendant's objections that they were gory, the trial judge admitted several photographs—including two morgue photos of the deceased, and photos of bloodstained bricks and glass. The trial court also overruled defendant's objection and allowed Officer Soltysiak to testify about photos taken after defendant's arrest depicting certain marks on his face. Officer Soltysiak then testified that he was present when defendant appeared at Area 4 headquarters on April 18, and that he noticed the same scratches on his face. On cross-examination, Soltysiak admitted that he had no way of knowing the source of the marks. A photograph of defendant that was taken on April 18, depicting the marks, was then admitted into evidence.

During defendant's case in chief, Detective Sherry was recalled and testified that when he interviewed Bates in his apartment on March 28, 1986, he at first denied any knowledge of the incident. And although Bates testified that he told Sherry that he saw two people in the alley, Sherry testified that Bates told him he saw three people in the stairway, under the porch, but that he could not identify them due to his poor eyesight. On cross-examination, over defendant's objection, Sherry testified that Bates said that he was too scared to get involved.

Also recalled, Officer Soltysiak testified that he had interviewed Polk twice. Polk at first denied any knowledge of the incident, but after he was told that someone had seen him in the alley, he stated that he saw defendant's physique.

After the instructions conference, the trial court denied defendant's request for a continuance so that Willie Cobbs could be brought in to testify. According to defense counsel, Cobbs was aware of the threats made by Barber.

As noted above, the jury found defendant guilty of murder and not guilty of aggravated criminal sexual assault. At sentencing, the State filed a victim impact statement prepared by the deceased's brother, Ralf Shines. Shines also testified about the emotional impact caused by his sister's death upon their family.

Finding defendant's crime to be an exceptionally brutal and heinous one, the trial court sentenced him to an extended term of 60 years in the custody of the Illinois Department of Corrections.

■■ ■ Defendant contends that the trial court improperly admitted evidence that a week before the murder, he grabbed Simms,

dragged her into an alley, and made lewd comments to her—testimony that the judge allowed on the ground that it showed that Simms' abduction and the murder of the deceased were part of a common design or scheme. "[E]vidence which goes to show *** common scheme or plan or *modus operandi* may *** be received even though it may show the commission of a separate offense. [Citations.]" (*People v. Allen* (1989), 184 Ill. App. 3d 438, 449.) However, the evidence must be "relevant to prove [a] material fact in issue other than defendant's propensity to commit a crime [and there must be] a similarity between the other crimes and the offense with which defendant is charged. [Citations.]" (184 Ill. App. 3d at 448-49.) Here, there is no evidence that the deceased's presence in the alley was involuntary, that defendant was the source of the sperm found in her vagina, indeed, that he had sex with the deceased, and if so, whether the sex was consensual. Thus, in contrast to *Allen*, there appears to be a total absence of similarities between the Simms incident and the case at bar.

The "common design or scheme" exception to the general rule that evidence of other crimes or wrongful conduct is inadmissible "refers to a larger criminal plan of which the crime charged is only a part. [Citation.]" (*People v. Bayer* (1987), 160 Ill. App. 3d 218, 221.) There was no evidence that the abduction of Simms and the murder in this case were part of a common scheme. However, in light of the clear and unequivocal testimony of three witnesses who placed defendant at the scene of the crime at the approximate time that it was committed and under the circumstances described by them, we hold such error to be harmless. (*Allen*, 184 Ill. App. 3d at 451.) "[T]he concern of a reviewing court is prejudicial error, and the court need not determine that a trial was devoid of error before affirming a conviction." (*People v. Warmack* (1980), 83 Ill. 2d 112, 129.) In *Warmack*, the court found that although it was error to allow evidence of a prior arrest when it was not relevant to any issue in the case, it was harmless error since a trial without such error, considering the totality of the evidence, would have produced no different a result. (83 Ill. 2d at 128-29.) We are satisfied that the result in this case would have been no different in the absence of the objectionable evidence admitted by the trial court.

Defendant next alleges that the trial court improperly admitted certain autopsy photos. As our supreme court noted in *People v. Lefler* (1967), 38 Ill. 2d 216, 221, "courts have been strict in the requirement that a proper purpose be shown for the introduction of such pictures." Although in *Lefler* the court held that it was error to

admit photographs of an autopsy because the extent of the deceased's injuries appeared exaggerated due to the autopsic incisions, here, defendant's objection was not based on any charge that the photographs appeared to exaggerate the extent of the deceased's injuries. Furthermore, in *People v. Speck* (1968), 41 Ill. 2d 177, 203-04, *rev'd on other grounds* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279, despite the fact that the parties had stipulated to the identity of the decedents and to the causes of their deaths, the court admitted autopsy photos to prove defendant's premeditation and the extent of the injuries he was alleged to have inflicted, holding that trial courts are given great discretion in deciding whether to admit such evidence. We are persuaded that the trial court here did not abuse its discretion in admitting the disputed photos.

■ Defendant also asserts that the admission of testimony concerning a photograph, and the photograph itself, showing scratches on his face, were incorrectly admitted because they were taken 23 days after the murder, thus constituting "a classic example of prejudice outweighing probative value." However, we regard the evidence as highly probative considering that there was medical testimony that the victim tried to defend herself and that there was other evidence that sharp objects were found near the deceased. The jury could have reasonably concluded that in using the glass or other sharp objects which had accumulated in the alley, the victim could have scratched defendant's face in the process of defending herself. We therefore hold that "the trial court's decision that the probative value of this evidence outweighed its prejudicial impact was not an abuse of discretion and, therefore, not error." *People v. Torres* (1990), 198 Ill. App. 3d 1066, 1074.

■ Defendant also contends that his due process rights were violated because the State failed to prove him guilty of murder beyond a reasonable doubt. When deciding whether a verdict is supported by the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [(Emphasis in original)]' " (*People v. Young* (1989), 128 Ill. 2d 1, 49, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.) Bates, Polk and McGhee all testified to having seen the defendant, whom they all knew, at the murder scene on the evening of March 25, 1986. Polk testified that he saw a person lying on the ground next to the defendant, and Bates testified that he had known the deceased for 10 years, heard her cry for help, and that defendant threatened to shoot

him if he did not leave. In light of such evidence, we hold that the verdict was fully consistent with all due process requirements.

Defendant next contends that the trial court's admission of testimony concerning certain out-of-court identifications of defendant were inadmissible hearsay used improperly to bolster the witnesses' credibility. Specifically, he alleges that the trial judge admitted Polk's prior statements consistent with his testimony when, over defendant's objection, he stated that on March 25, 1986, he called 911 and told the police that they were looking for Terry Gray, and that on April 12, 1986, at police headquarters, he told the police about his 911 call and about his identification of the defendant. Further, Bruno Waltman, a police department dispatcher, testified over defendant's objection that on March 25, 1986, he received a call from a black male who said that a murder had been committed in an alley near 13th and Kedzie, and that Terry Gray was a possible offender.

The prosecution responds that "[a] statement [of identification] is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." (Ill. Rev. Stat. 1985, ch. 38, par. 115—12.) Under the statute, the State argues, both Polk's and Waltman's statements were admissible because both testified at trial and were subject to cross-examination, and the statements of identification were made by Polk after having observed defendant in the alley. *People v. Lemons* (1989), 192 Ill. App. 3d 997, 1001-02; *People v. Kelly* (1989), 185 Ill. App. 3d 43.

■ Defendant alleges, however, that Polk's statements to the police that they were looking for Terry Gray were not an identification because on March 25, 1986, Polk saw only defendant's body build and did not see his face. Instead, defendant contends, Polk's statements to the police were merely disguised hearsay. Preliminary to the legal question of whether there was an identification is the factual one of whether Polk's statements to the police were based upon his observations or based upon his discussion with one Sam Redmond, who was just leaving the alley as Polk was entering it. Implicit in the trial judge's holding is the finding that Polk's statements were based upon his observation of the defendant, a finding which we conclude to be reasonable. Assuming, *arguendo*, that the trial judge abused his discretion in admitting this evidence, we conclude that such admission does not constitute reversible error. *People v. Sadaka* (1988), 174 Ill. App. 3d 260, 264.

■ After Bates had testified that he had seen the defendant with the deceased, that he heard her scream for help, and that defendant threatened him, the defense impeached him by eliciting testimony that he had earlier told the police that defendant never spoke to him on March 25, 1986, and that his poor eyesight prevented him from making an identification. Defendant claims that on redirect, the State improperly used leading questions and hearsay to rehabilitate him by establishing that Bates was initially afraid to testify that he saw the defendant with the deceased on the night of the murder. The trial court has considerable discretion in determining whether to permit leading questions. (*People v. Hirschmann* (1988), 175 Ill. App. 3d 150, 154.) Assuming, *arguendo*, that the trial judge abused his discretion in allowing the questions, we hold that the defendant waived his objection by not raising it in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Moreover, in light of the overwhelming evidence presented against defendant, this court would be unwarranted in invoking the plain error rule in this case. (*People v. Nevitt* (1990), 135 Ill. 2d 423, 448.) The plain error rule does not operate in the nature of a general savings clause preserving for review all errors affecting substantial rights which were not properly preserved in the trial court. (*People v. Precup* (1978), 73 Ill. 2d 7.) The criteria for applying the rule are whether the evidence is closely balanced, or whether the verdict would have been different had the error not occurred, or whether the error is of such magnitude that the defendant is denied a fair and impartial trial. (*People v. Young* (1989), 128 Ill. 2d 1.) As a matter of grace, a reviewing court may address an issue of plain error only when such criteria are present (*People v. Pickett* (1973), 54 Ill. 2d 280, 283; *People v. Bracy* (1986), 152 Ill. App. 3d 566); but we do not find them to exist here.

■ The defendant next complains that evidence of the investigation leading up to his arrest was improperly admitted and that the prosecution's opening statement referring to the investigation was prejudicial. Without any citation to the record, he alleges that at trial the State charged that the police "hunted" for him and that he "seemed to have vanished from the neighborhood." The State responds that because the police had contacted his mother and numerous other relatives looking for him and because defendant surrendered to the police only after a warrant was issued for his arrest, such evidence was admissible to show the circumstances of the arrest and to show consciousness of guilt. There are several reasons for our holding that the trial court did not abuse its discretion in permitting the State to make its arguments and in admitting the disputed evi-

dence: (1) defendant's failure to object to the statement that defendant had vanished constitutes waiver (*People v. Carlson* (1980), 79 Ill. 2d 564, 576); (2) defendant's failure to make any citation to the record concerning the State's allegedly prejudicial comments about the "hunt for Terry Gray" (134 Ill. 2d R. 341(e)(6)); and (3) the recent ruling of our supreme court in *People v. Hayes* (1990), 139 Ill. 2d 89, 131-32, which holds that the State may properly comment about the length of the search for the defendant to prove the circumstances of the arrest. (*Hayes*, 139 Ill. 2d at 132.) Accordingly, defendant has failed to make the requisite showing of error.

■■■ The defendant also complains that the trial court's decision forbidding him to cross-examine Detective Rave concerning the victim's arrest in 1978 for soliciting in a public way deprived him of the right to confront witnesses under the sixth and fourteenth amendments to the constitution of the United States. We hold, however, that defendant has waived his right to raise this issue on appeal since he did not object to the State's motion *in limine,* which the court granted and which prohibited such inquiry, nor did he include this point in his written post-trial motion. (*Enoch,* 122 Ill. 2d at 186.) Nor do we find plain error, for we are satisfied, as we have already noted, that the verdict is supported by overwhelming evidence; moreover, the verdict returned by the jury here was obviously not dependent upon evidence necessary to support the sexual assault charge. Accordingly, since the previous arrest of the deceased is totally irrelevant to whether defendant murdered the deceased, we hold that he was not denied a fair trial.

■■■ Defendant also contends that he was denied a fair trial because he was barred from cross-examining Detective Sherry as to whether he had heard that another suspect, Willie Barber, had threatened the deceased. However, threats against a victim of a crime made by a person other than the defendant are inadmissible hearsay. (*People v. King* (1916), 276 Ill. 138; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.5, at 635 (5th ed. 1990).) Therefore, the trial court properly excluded these statements.

■■■ Defendant next argues that in closing argument, the prosecution implicitly shifted the burden of proof to him when it was permitted to assert that "[i]n order for you to find him not guilty, you have to honestly believe that those three people, [Simms, McGhee and Bates] *** somehow got together and conspired this satanic conspiracy to point to an innocent man and to say that he killed another human being." However, here again we are constrained to hold that since the evidence incontestably established defendant's guilt beyond

a reasonable doubt, the trial court's error, if any, cannot be regarded as prejudicial to the extent of requiring reversal. *People v. Tate* (1981), 87 Ill. 2d 134, 148.

 Defendant further asserts that his constitutional right to effective assistance of counsel was violated when the State admitted evidence of the emotional suffering of the victim's relatives, although he raised no objection to such evidence in the trial court. Acknowledging that a victim impact statement is not admissible in capital cases (*Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529), defendant argues that the prohibition should be extended to noncapital cases. Furthermore, defendant argues that the admission of the impact evidence violated section 5—4—1(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—4—1(a)), which determines what evidence is admissible at sentencing hearings. However, our supreme court has already addressed this issue. Even if we were to assume for the purposes of argument that the statute was violated:

> "[w]e hold that allowing this [victim impact] statement at the noncapital sentencing hearing did not violate the defendant's constitutional rights. In light of the strong evidence of guilt, we find that the error in the admission of this evidence was not reversible." *People v. Turner* (1989), 128 Ill. 2d 540, 578, 539 N.E.2d 1196.

 Defendant alleges, in the *pro se* brief that he was given leave by this court to file, that the following jury instruction was improperly read to the jury: "The fact that the defendant did not testify should be considered by you in any way in arriving at your verdict." He claims, of course, that the instruction should have been worded "should *not* be considered." (Emphasis added.) However, we are bound by the certified record of proceedings conducted in the trial court, and that record is presumed to be correct unless it can be shown to be otherwise. (*People v. Vincent* (1988), 165 Ill. App. 3d 1023, 1030.) As the court held in *People v. Lewis* (1979), 75 Ill. App. 3d 259, 286:

> "[I]f the correct instructions had been submitted in written form to the jury in the jury room, a prior error in the reading of the instructions would have been cured and prejudicial error would not have resulted. In the case at bar, the error in the reading of the instructions was corrected by the the submission of correct, written instructions to the jury in the jury room."

Therefore, because the jury received the correct written instruction, the error in giving the incorrect oral instruction was cured.

Defendant also argues *pro se* that the cumulative effect of the errors at trial was not harmless. However, because the identification by even a single eyewitness may be sufficient to support the conviction of a defendant (*People v. Hayes* (1990), 139 Ill. 2d 89, 147), we find the evidence to be quite enough to sustain the verdict at trial. The other issues that defendant raises *pro se* are either too frivolous to require discussion or were waived because they were not addressed at trial (*People v. Carlson* (1980), 79 Ill. 2d 564, 576), and we hold that none of those waived at trial would constitute plain error.

For all of the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

HARTMAN and DiVITO, JJ., concur.