(No. 86168.—<span style="background:black">    </span>

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY HALL, Appellant.

*Opinion filed December 1, 2000.—Rehearing denied January 29, 2001.*

BILANDIC, J., joined by MILLER, HEIPLE and RATHJE, JJ., specially concurring.

HARRISON, C.J., dissenting.

Charles M. Schiedel, Deputy Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Charles Reynard, State's Attorney, of Bloomington (Joel D. Bertocchi, Solicitor General, and William L. Browers and Rebecca Zavett, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the judgment of the court:

Following a 1984 bench trial in the circuit court of McLean County, defendant, Anthony Hall, was convicted of murder. Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a). At a separate sentencing hearing, the court, sitting without a jury, found defendant eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence. Pursuant to defendant's subsequent petition for a writ of *habeas corpus*, the United States Court of Appeals for the Seventh Circuit ordered that defendant receive a new sentencing hearing. *Hall v. Washington*, 106 F.3d 742 (7th Cir. 1997).

The circuit court of McLean County held a new sentencing hearing. A jury determined that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. Accordingly, the court sentenced defendant to death. The death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). We affirm.

## BACKGROUND

The record contains the following pertinent facts. On February 8, 1983, the body of the victim, Frieda King, was found in a closet next to a walk-in freezer at the Pontiac Correctional Center. She had been stabbed to

death. At the time of the murder, the victim had been the civilian supervisor of the inmate kitchen, where defendant had been working as a clerk. After an investigation, defendant was charged in the circuit court of Livingston County with the murder.

Following a change of venue to McLean County, the circuit court convicted defendant of murder and imposed the death penalty. On direct review, this court upheld defendant's conviction and sentence. *People v. Hall*, 114 Ill. 2d 376 (1986), *cert. denied*, 480 U.S. 951, 94 L. Ed. 2d 802, 107 S. Ct. 1618 (1987). Defendant subsequently petitioned the circuit court for relief pursuant to the Post-Conviction Hearing Act (Ill. Rev. Stat. 1989, ch. 38, par. 122—1 *et seq.*). Following an evidentiary hearing, the circuit court denied defendant's petition and this court affirmed. *People v. Hall*, 157 Ill. 2d 324 (1993), *cert. denied*, 513 U.S. 999, 130 L. Ed. 2d 415, 115 S. Ct. 507 (1994).

The United States District Court for the Central District of Illinois denied in full defendant's petition for a writ of *habeas corpus*. *Hall v. Washington*, 916 F. Supp. 1411 (C.D. Ill. 1996). However, the United States Court of Appeals for the Seventh Circuit reversed in part, holding that defendant "received ineffective assistance of counsel at his capital sentencing hearing and that he must be granted a new sentencing hearing." *Hall v. Washington*, 106 F.3d 742, 753 (7th Cir. 1997).

The circuit court of McLean County held a new sentencing hearing. Prior to the first stage thereof, defendant moved to stipulate that: he had attained the age of 18 years at the time of the murder of which he was convicted, and that the murder victim was a Department of Corrections employee who was killed in the course of performing her official duties. See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(2). The trial court granted defendant's motion and, based thereon, found that he was eligible for the death penalty.

At the second stage of the capital sentencing hearing, a jury heard evidence in aggravation and mitigation. We recount the aggravation evidence that the State presented in the order that the events occurred.

One morning in September 1975, defendant, age 16, approached Kathy Ford Washington as she was on her way to work. He asked her for the time. When she looked up from her watch, he was displaying a handgun. He demanded her money and became upset upon discovering that she did not have much. He forced her to walk into a vacant building, where he raped her at gunpoint. He eventually pled guilty to armed robbery and was sentenced to a prison term of four years.

In October 1975, defendant entered the bedroom of Denise Smith and her sister Hermie. He raped and robbed each at gunpoint. He eventually pled guilty to rape and was sentenced to a four-year prison term.

Defendant was incarcerated in a juvenile detention facility until he was 18, at which time he was transferred to Menard Correctional Center. There, in February 1978, a large fight began during a lunch period, which grew to involve as many as 30 inmates. Defendant held an inmate while two others beat, kicked, and twice stabbed the inmate. As discipline, defendant lost one year of good-time credit on his sentence. Defendant was imprisoned for approximately three years.

One afternoon in November 1980, Alfreda McIntosh was walking down a street. Defendant called out to her, asking if he knew her. McIntosh replied in the negative and walked faster. Defendant ran to her, put his arm around her, and held a knife to her. Upon his demand, McIntosh gave defendant her money.

Defendant directed McIntosh at knifepoint to a building; she refused to enter. Defendant then took her around the side of the building and forced her to sit on some stairs. Defendant then ordered McIntosh to pull down

her pants. As she stood to do so, she grabbed defendant's knife. A struggle ensued, in which McIntosh was cut. Defendant overpowered her, retrieved his knife, returned her to the stairs, and repeated his demand. When she complied and ceased struggling, defendant lost his erection and could not penetrate her.

The State elicited from McIntosh that the attack had long-term effects on her. She found it difficult to be around men, especially in trains, buses, and elevators.

Defendant was eventually indicted on several charges relating to the McIntosh attack, tried, and convicted of armed robbery and armed violence. He was sentenced to a prison term of 40 years.

Defendant was serving this sentence when, on February 8, 1983, he murdered the victim in this case. Through witnesses and exhibits, the State recounted its case against defendant at the guilt phase of his trial. See *Hall*, 114 Ill. 2d at 392-98.

In July 1983, a female correctional officer delivered books and magazines to defendant in his cell. Defendant made a lewd comment and exposed himself to her. A few days later, defendant asked the officer to deny the incident and retract her report. He feared that the incident would be used against him at his murder trial.

Attorney Steven Skelton testified to an incident that occurred at defendant's trial. On February 24, 1984, immediately prior to opening statements, defendant requested to proceed *pro se* and asked for a continuance to prepare his defense. The trial judge brought defendant; his two defense counsel, Skelton and David Ahlemeyer; and a court reporter into a conference room adjoining the courtroom. They were discussing defendant's representation when defendant struck Skelton on the head with a chair, threw the chair at Ahlemeyer, and then punched the trial judge on the head. See *Hall*, 114 Ill. 2d at 389-90.

Later that day, defendant was taken from the courthouse to the Logan Correctional Center. He was the lone inmate in the prison's segregation unit. After about an hour, defendant questioned why he was the only inmate there, grew afraid that he would be beaten, and became very agitated. He wrenched a nine-foot piece of steel from his cell wall and wrecked his cell, screaming that he had to leave. After about an hour he calmed down.

In January 1985, a correctional officer heard defendant state that he wanted to decapitate the warden of his prison, even if it meant receiving another death sentence. Defendant explained to the correctional officer that the warden had told lies about defendant. The incident was reported, but defendant was not disciplined.

On three occasions, in June 1987, May 1989, and February 1990, defendant had sexual contact with female visitors in prison visiting rooms. In August 1994, defendant masturbated in front of a female correctional officer and ejaculated on one of her shoes.

Also, a sister of the victim presented victim impact testimony. The victim came from a family with originally 13 siblings. One sibling died as an infant and the victim was only the second sibling to die. The victim was very close to her siblings; she was more like a mother to them.

The victim had seven children, all living at the time of her death. She also had six grandchildren, three of whom were born after she was killed and whom she would never meet. She was a loving mother and grandmother. The victim's youngest son and one of her brothers lived with the victim in her house. She cared for them and made a home for them.

The victim was very proud of and active in the Veterans of Foreign Wars. She carried the flag in every parade. She bought a rabbit suit with her own money to entertain children at various functions.

The victim was not afraid of working in a prison. She

believed that the inmates would never hurt her. In fact, many of the inmates referred to the victim as "Mom."

Defendant presented mitigation evidence from family and acquaintances, prison employees, and clergy and counselors. This evidence was presented through live testimony, affidavits, and transcripts of testimony from prior proceedings.

Defendant's mother, Annie Rogers, testified via videotape due to physical impairments. Rogers testified as follows. She was raped when she was 12 years old, resulting in defendant's birth. Because she did not know how to care for a child, Rogers' mother raised defendant. She was not married and had to work during the day. Rogers' aunt and a neighbor helped look after defendant. He completed elementary school, but did not complete high school.

Rogers married when she was 16; the marriage produced two children. Defendant never lived with Rogers during her marriage or was part of her household. Rogers' husband eventually abandoned her and she had to return to her mother's home. She had to quit her job because one of the children from her marriage began to fight at school.

Rogers credited defendant with sustaining her. She had visited defendant in prison, but now was unable to travel. She enjoyed writing to defendant and receiving cards and letters from him. Rogers acknowledged that she did not "pay any attention" to defendant when he was a child. However, she loved him and wanted to be a mother to him if it was not too late.

The defense sought to introduce a 1990 affidavit by Patricia Rolfe Hunt, which defendant presented in his post-conviction proceeding. The defense had been unable to obtain her presence at the sentencing hearing. Hunt's affidavit stated essentially as follows. She was 41 years old, married with six children, and an active church

member. She is not related to defendant, whom she had known since the early 1970s, when he was between 12 and 14 years old. Defendant baby-sat for Hunt during this time, and she would see him almost daily. Hunt found defendant to be an honest, dependable, and mild-mannered young man, who did not appear to be violent. She trusted him to such an extent that she would leave money around her home; defendant never took anything from her.

Hunt recalled an incident where defendant saved the life of one of her children. The child began choking on a bone. Hunt was frightened and unable to respond, but defendant responded and saved the child's life.

After losing contact with defendant for several years, Hunt eventually learned that he was in prison. Since she liked, respected, and had fond memories of him, Hunt contacted defendant and visited him in 1988 or 1989. She had spoken with defendant in 1990 when she executed her affidavit.

In response to the State's objection, the trial court excised the reference to defendant's saving the life of one of Hunt's children. Defendant's trial counsel read the redacted affidavit to the jury.

Leta Mills testified as follows. When Mills was 14 years old, she participated in a summer camp swimming tournament. During a race, she passed out in the deep end of a pool. Defendant rescued her and administered first aid. They became friends. In the early 1980s Mills began to visit defendant in prison. She was married between 1981 and 1984. In 1985, Mills resumed visiting defendant. It was Mills who had sexual contact with defendant in May 1989 and February 1990. During that time they were engaged to be married; the engagement ended sometime in 1990. They correspond with each other and will always be friends.

Scott Wineberg testified to several telephone conver-

sations he had with defendant. During that time, Wineberg was a student at Chicago-Kent College of Law. He worked, under the supervision of defendant's trial counsel, in the school's clinical program. Wineberg's first assignment was defendant's case.

During the summer of 1990, defendant telephoned Wineberg regarding his case quite often, generating telephone bills of about $300 per month. In these conversations, defendant expressed concern and compassion for others, namely his trial counsel and Wineberg's family and classmates. Through these conversations, Wineberg came to know defendant as a person. Defendant additionally sent letters and holiday cards to Wineberg.

Yvonne Del Vecchio testified as follows. She was the mother of George Del Vecchio, a former Menard inmate who had been executed. George was last imprisoned at Menard for about 18 years. Several years prior to his execution, George spoke of defendant to Del Vecchio. Defendant and George were friends; they spoke of church and religion. Del Vecchio actually met defendant after George was executed. They have corresponded with each other since 1997. In his letters, defendant showed care and concern for her and for others, and never acted improperly in any way. Also, Del Vecchio visited others in prison. She would occasionally see defendant and they would greet each other.

Defendant also presented mitigation evidence from prison employees. From 1979 until her retirement in 1991, Gwendolyn Teske was a food supervisor at Pontiac. She had worked with the victim, and had supervised defendant. During this time, Teske did not observe defendant act violently toward herself or anyone else. He always fulfilled his duties and was very cooperative.

At approximately the beginning of 1983, Thomas O'Connor began working as a clerk in Pontiac's food ser-

vice department. There he met defendant and worked with him daily. Defendant was in charge of completing various government regulatory forms. He also planned master menus, often over a year in advance. He was efficient and competent. Indeed, defendant was the only person in the department who really knew much about its operations. Defendant was very helpful to O'Connor and assisted in training him. Defendant never acted inappropriately. To the contrary, in some ways defendant was instrumental in improving relations between department staff and inmates.

In 1993, Colleen Rennison began working as a paralegal at Menard. Her function was to supervise the prison law library to make legal resources available to inmates. It was not part of her job to learn the details of inmates' cases. Her duties included touring the prison's condemned unit two to three times weekly, totaling approximately eight hours.

Rennison met defendant in the early spring of 1993. Defendant was eager to learn new words. She would help defendant and other inmates to read and write. Defendant was trying to learn more about the legal system. She saw him in the library and in his cell. Defendant kept his cell very neat, and never had anything inappropriate on his cell walls. Defendant never acted inappropriately toward Rennison, or anyone else to her knowledge. Rather, defendant was very pleasant.

Defendant presented mitigation evidence also from clergy and counselors. Lloyd Shaddle had testified on defendant's behalf at defendant's first sentencing hearing (see *Hall*, 114 Ill. 2d at 401). Shaddle subsequently died. At the second sentencing hearing, defense counsel read the transcript of Shaddle's testimony.

Shaddle testified as follows. He was a minister for the Jehovah's Witnesses. He had known defendant since 1982. Shaddle conducted Bible studies at Pontiac. Defen-

dant regularly attended these Bible classes until he was charged with the victim's murder. Thereafter, Shaddle twice visited defendant, who expressed more concern for his family than for himself.

Father Richard Means had testified on defendant's behalf at the evidentiary hearing on defendant's post-conviction petition (see *Hall*, 157 Ill. 2d at 337). Father Means subsequently died. At the second sentencing hearing, defense counsel and another priest read responsively the transcript of Father Means' testimony.

Father Means testified as follows. From February 1983 to August 1986, he was a Roman Catholic chaplain in the Illinois Department of Corrections. He met defendant shortly after the murder charge. For over a year, he spent more time with defendant than with any other prisoner. Means found defendant to be intelligent, very literate, and very interested in religion. Means found defendant's interest in religious studies to be sincere. They never spoke much about this case, but defendant at times spoke fondly of the victim. Means never saw defendant lose his temper or act violently. Means had never before testified at a death sentencing hearing on behalf of an inmate. However, after great reflection, he had decided to appear on defendant's behalf.

Major Daniel Hudson testified as follows. He was a Salvation Army minister, who was engaged in full-time prison work. As a correctional services coordinator, he supervised four chaplains and had at least 43 federal, state, and local prisons and jails in his region. One Sunday per month for the previous six years, Daniel and his wife, Martha, conducted religious services at Menard. Defendant attended nearly all of those services, through which Daniel and Martha came to know defendant. In fact, Daniel spent more time with defendant than with other inmates. They discussed, *inter alia*, religion, about which defendant seemed sincere. Defendant showed

concern for his mother and asked Daniel to pray for her. Daniel and Martha, who testified separately on defendant's behalf, never observed defendant act improperly toward correctional officers or inmates. Martha felt safe and comfortable in defendant's presence.

Daniel also described the lack of privacy at Menard. Since cells, and even showers, lacked conventional doors, the only possible way for an inmate to obtain privacy is to hang a sheet or blanket on his cell bars. Daniel regularly encountered inmate nudity and, occasionally, even inmate self-gratification. Again, however, Daniel never observed defendant act improperly. This was the first time that Daniel ever testified in court. Daniel wanted to appear on behalf of defendant, who never asked Daniel to do so.

John Nordgaard testified as follows. A Lutheran minister, he developed a prisoner and family program through Lutheran Social Services of Illinois. Through small groups, this secular program monitored death row conditions and helped death row inmates maintain contact with families and lawyers. Nordgaard began visiting the condemned unit at Menard in 1981 or 1982. He met defendant in 1985 when defendant was placed in the condemned unit. Nordgaard also described the lack of privacy at Menard. He visited Menard on the average of five times per year, and only on a very few of those visits did he not spend time with defendant. In their conversations, and in letters to Nordgaard, defendant expressed sincere concern for his and Nordgaard's families. Defendant had never acted inappropriately towards Nordgaard or anyone else.

Jacquelyn Wallace testified as follows. She was a Cook County juvenile probation officer and an ordained minister. Around 1990, Wallace served as a director in Prison Fellowship. She visited Menard as a member of the coalition that Reverend Nordgaard described. She

met defendant through those visits and had visited him ever since, every other month for seven years. Also, defendant regularly telephoned Wallace, at least once per month. Their conversations included religious matters. Wallace found defendant to be genuine and sincere. Defendant had never acted improperly towards Wallace or anyone else.

At the close of the sentencing hearing, the jury found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The trial court accordingly sentenced defendant to death.

Defendant appeals. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

## DISCUSSION

Defendant contends he was denied a fair capital sentencing hearing because: (1) the State introduced victim impact evidence from the victim of a prior crime; (2) the trial court erroneously excluded several items of mitigation evidence; (3) the State's cross-examination of defense witnesses was improper; (4) the State's closing argument was inflammatory; (5) the trial court's explanation to the jury of the role of "mercy" in a capital sentencing hearing was confusing and erroneous; and (6) the trial court refused to allow defendant to address the jury in allocution. Defendant also contends: (7) this case should be remanded to the trial court for a determination of whether he was taking a "psychotropic-type" drug at his original trial; and (8) the Illinois death penalty statute is unconstitutional.

### I. Victim Impact Evidence: Prior Crime

Defendant first contends that he was denied a fair capital sentencing hearing because the State elicited from Alfreda McIntosh that defendant's attack had long-term effects on her. She testified that she found it difficult to be around men, especially in trains, buses, and elevators.

Defendant relies on *People v. Hope*, 184 Ill. 2d 39, 51 (1998), in which this court held that, based on the eighth amendment, "victim impact evidence will come only from a survivor of the murder for which the defendant is presently on trial, not from survivors of offenses collateral to the crime for which defendant is being tried."

However, the record shows that defendant neither objected to McIntosh's testimony nor included the issue in his post-sentencing motion. Therefore, the issue is waived. *People v. Turner*, 128 Ill. 2d 540, 555 (1989). Nevertheless, defendant characterizes McIntosh's testimony as plain error under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)). The plain error rule may be invoked if the evidence at a sentencing hearing was closely balanced, or if the error was so egregious as to deprive the defendant of a fair sentencing hearing. *People v. Moore*, 171 Ill. 2d 74, 111 (1996).

After reviewing the record, we conclude that this issue does not satisfy either requirement of the plain error rule. Initially, we do not consider the evidence in aggravation and mitigation to be closely balanced. It is true that defendant presented mitigation evidence from many witnesses, which touched upon several areas of his life. These witnesses essentially recounted defendant's troubled childhood and vouched for his good character.

However, defendant's mitigation evidence must be weighed against the aggravation evidence. In denying his federal *habeas corpus* petition, the federal district court noted defendant's "considerable criminal history" and described the aggravating nature of this murder:

"However, these general allegations of [defendant's] good character and childhood deprivations hardly rebut the laundry list of aggravating evidence stacked against him. To begin with, [defendant] is a convicted murderer. He carried a knife to the cold storage area of the prison with the intent to murder [the victim] in cold blood. The number of wounds inflicted upon her body was evidence

that she suffered a brutal death. [Defendant] committed this murder despite his regular attendance at bible study classes in prison. He used his assignment in the inmate kitchen to commit the murder. He killed [the victim] while she was working in the course of her duties at the prison." *Hall*, 916 F. Supp. at 1429.

"The brutal facts of this murder, balanced against the evidence offered in mitigation, render a conclusion that the evidence was not closely balanced." *People v. Williams*, 192 Ill. 2d 548, 585 (2000).

Additionally, the State's error was not so egregious as to deprive defendant of a fair sentencing hearing. It is true that the State erroneously elicited from McIntosh that defendant's attack adversely affected her. This is admittedly impact evidence from the victim of another crime, which "is irrelevant and therefore inadmissible." *Hope*, 184 Ill. 2d at 53. However, the typed transcript of McIntosh's testimony was 28 double-spaced pages, while the State's elicitation was in the form of only one question, which McIntosh answered in seven lines. Considering the significant aggravation evidence, and McIntosh's brief answer, we conclude that the State's error was harmless beyond a reasonable doubt. See *People v. Towns*, 174 Ill. 2d 453, 468-71 (1996); *People v. Scott*, 148 Ill. 2d 479, 553-54 (1992); *People v. Crews*, 122 Ill. 2d 266, 286-88 (1988). Therefore, this error does not constitute plain error. Accordingly, defendant's procedural default of this issue is not excused.

II. Exclusion of Mitigation Evidence

Defendant next contends that the trial court erred in excluding several items of written mitigation evidence. The trial court excluded that portion of the Hunt affidavit referring to defendant's saving the life of one of Hunt's children, and two letters from persons who corresponded with defendant.

To meet constitutional standards, a capital sentencing hearing must allow for individualized consideration

of the offender and the offense. In conjunction with this requirement, the sentencer in a capital case may not be precluded from considering, or refuse to consider as a matter of law, any relevant mitigation evidence offered by the defense. Allowing the sentencer to consider all relevant mitigation evidence satisfies the requirement of individualized sentencing in capital cases. *People v. Hudson*, 157 Ill. 2d 401, 454 (1993).

Accordingly, the ordinary rules of evidence are relaxed at the aggravation-mitigation stage of a capital sentencing hearing. This is necessary because it is important that the sentencer possess the fullest information possible with respect to the defendant's life, character, criminal record, and the circumstances of the particular offense. *People v. Kliner*, 185 Ill. 2d 81, 171 (1998); *People v. Edgeston*, 157 Ill. 2d 201, 236 (1993). As a result, the only requirement for the admissibility of evidence at this stage of a capital sentencing hearing is that the evidence be relevant and reliable. *Edgeston*, 157 Ill. 2d at 236.

## A. *Standard of Review*

The parties initially disagree as to how we should apply the above-stated principles to this case. The State contends that we should review deferentially the trial court's exclusion of this proffered evidence. The determination of relevant and reliable evidence at a capital sentencing hearing rests in the sound discretion of the trial court. *Kliner*, 185 Ill. 2d at 171; *Hudson*, 157 Ill. 2d at 450. Although a reviewing court may have ruled differently, the trial court's evidentiary ruling may not be reversed absent a clear abuse of discretion. *People v. Enis*, 139 Ill. 2d 264, 281 (1990). An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Reviewing courts gen-

erally use an abuse-of-discretion standard to review evidentiary rulings rather than review them *de novo*. *People v. Childress*, 158 Ill. 2d 275, 296 (1994).

Defendant, however, contends that we should review *de novo* the trial court's exclusion of this proffered evidence. It is true that reviewing courts sometimes review evidentiary rulings *de novo*. This exception to the general rule of deference applies in cases that involve questions of statutory interpretation (*e.g.*, *People v. Kinsloe*, 281 Ill. App. 3d 799, 806-09 (1996)), or other questions of law (*e.g.*, *People v. Williams*, 188 Ill. 2d 365, 369 (1999); *People v. Aguilar*, 265 Ill. App. 3d 105, 109 (1994)). Defendant reasons that the evidentiary rulings at issue here involved no fact-finding based on the demeanor or credibility of the witnesses because the evidence was written. Citing *People v. Coleman*, 183 Ill. 2d 366, 387 (1998), defendant argues that the trial court's evidentiary rulings were uniquely legal rulings, which we may review *de novo*.

We reject defendant's argument and review these evidentiary rulings with deference to the trial court. The following observations apply here: "The decision whether to admit evidence cannot be made in isolation. The trial judge must consider a number of circumstances that bear on that issue, including questions of remoteness and prejudice." *Childress*, 158 Ill. 2d at 296. In this case, the trial court exercised discretion in making these evidentiary rulings, *i.e.*, the court based these rulings on the specific circumstances of this case and not on a broadly applicable rule. See generally *United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir. 1996); *People v. Drum*, 307 Ill. App. 3d 743 (1999).

### B. *Hunt Affidavit*

Defendant contends that the trial court erred in excluding that portion of the Hunt affidavit referring to defendant's saving the life of one of Hunt's children.

Hearsay evidence, such as affidavits, may be admitted without cross-examination where relevant and reliable. *People v. Thomas*, 178 Ill. 2d 215, 246 (1997). For example, the trial court in *Thomas* was within its discretion in finding that affidavit evidence to be reliable because "the affidavits were reliable opinion evidence from trained experts who diagnosed defendant based on their professional experience." *Thomas*, 178 Ill. 2d at 246. In contrast, the trial court in this case determined that this information lacked sufficient detail to be reliable.

Defendant points to *Hall* from the federal court of appeals, in which the court specifically referred to this portion of the Hunt affidavit as an example of available mitigation evidence that defendant's trial counsel should have investigated. *Hall*, 106 F.3d at 746. Defendant reasons, therefore, that this information "was obviously relevant and compelling." However, the federal court of appeals was referring to assumed live testimony of Hunt, subject to cross-examination. Here, no guaranties of reliability were present. We cannot say that the trial court abused its discretion by excluding this portion of the Hunt affidavit.

### C. *Letters From England*

Defendant contends that the trial court erred in excluding two letters. The defense was unable to obtain the presence of two persons from England who had corresponded with defendant for several years. Each letter describes defendant's compassion, religious convictions, and concern for others.

We uphold the trial court's ruling. Although each writer had corresponded with defendant for several years, neither writer actually had met defendant. Indeed, one writer explained that defendant had written to an organization in England seeking "a pen-friend." The trial court expressly found that these letters lacked sufficient

reliability based on the circumstances under which they were written and the relationship between defendant and the writers. The judge also observed that the information in the letters required cross-examination and the inability to do so was extremely significant. We cannot say that the trial court abused its discretion in excluding these letters. See, *e.g.*, *People v. Thompkins*, 121 Ill. 2d 401, 454-55 (1988).

### III. State's Improper Cross-Examination

Defendant next contends that the State's cross-examination of several defense witnesses was improper. Generally, any permissible kind of impeaching matter may be developed on cross-examination, since one of the purposes thereof is to test the credibility of the witnesses. The latitude to be allowed on cross-examination rests within the sound discretion of the trial court; a reviewing court should not interfere absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *Thompkins*, 121 Ill. 2d at 454; *People v. Collins*, 106 Ill. 2d 237, 269 (1985).

Defendant claims that the State improperly: (A) questioned defense witnesses as to defendant's lack of remorse for murdering the victim; and (B) asked defense witnesses if they were present while defendant was murdering the victim. Defendant adds that the State exacerbated the prejudice from this questioning by its corresponding remarks during closing argument.

### A. *Lack of Remorse*

The State elicited from several defense witnesses that defendant never discussed with them the victim's murder, or sought forgiveness for murdering the victim. During closing argument, the State correspondingly remarked:

> "And what is interesting, you heard all these clergymen come to the witness stand and testify. Did you hear a single

one even breathe a hint to you that at any time for one second [defendant] ever indicated one shred of remorse for murdering [the victim] ***? Has he ever indicated to these clergymen, if he was truly a Christian, he is growing in the Christian faith, wouldn't you think that one of the things about growing in the Christian faith would be to take responsibility for what you have done and ask for forgiveness? He had opportunity after opportunity after opportunity after opportunity to ask for forgiveness and he never did it. He never showed any attempt to show remorse for [the victim].

\* \* \*

It is time for [defendant] to take responsibility like he has never done for the murder of [the victim]. Today is the day for him to take responsibility for her murder."

Defendant claims that he "retained the constitutional right not to make any statements to anyone about his case." Defendant asserts that the State, through this cross-examination and corresponding argument, impinged upon his fifth amendment privilege against self-incrimination, *i.e.*, his right to remain silent. He argues that the State directed the jury's attention to his failure to confess to these witnesses that he murdered the victim.

However, defendant objected only to the first of the questions of which he now complains; he did not contemporaneously object to subsequent questions and he failed to include this issue in his post-sentencing motion. Therefore, the issue is waived. *Turner*, 128 Ill. 2d at 555.

Defendant's invocation of the plain error rule is unavailing. Initially, as we earlier concluded, the evidence presented at the sentencing hearing was not closely balanced.

Addressing the second requirement of the plain error rule, the State's cross-examination and argument did not deprive defendant of a fair capital sentencing hearing. The fifth amendment right to remain silent does not ap-

ply to defendant under these circumstances. It must be remembered:

> "[T]here is no such thing as a constitutional privilege against self-incrimination. There is a privilege only against *compelled* self-incrimination. The key element is compulsion. The core purpose of the privilege is not to protect a defendant against self-incrimination generally nor even to guard a defendant against foolish and ill-advised self-incrimination; it is to shield a defendant against governmental coercion." (Emphasis in original.) *Ross v. State*, 78 Md. App. 275, 279, 552 A.2d 1345, 1347 (1989).

Without compulsion, " 'the gears of the Fifth Amendment privilege are not engaged. ***.' [Citation.]" *Hunter v. State*, 110 Md. App. 144, 164-65, 676 A.2d 968, 978 (1996). Indeed, we note that "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." *Colorado v. Connelly*, 479 U.S. 157, 166, 93 L. Ed. 2d 473, 483, 107 S. Ct. 515, 521 (1986).

In this case, defendant does not—and could not—assert that any incriminating statement he could have made to these witnesses would have been the result of governmental coercion or compulsion. Defendant's conversations with these witnesses were wholly voluntary. "For that reason, if for no other, it is clear that no right protected by the Fifth Amendment privilege against compulsory self-incrimination was violated in this case." *Hoffa v. United States*, 385 U.S. 293, 304, 17 L. Ed. 2d 374, 383, 87 S. Ct. 408, 414-15 (1966). Accordingly, there was no plain error, and defendant's procedural default of this issue is not excused.

### B. *Other Improper Questions*

Defendant contends that the State improperly cross-examined defense witnesses by asking them other irrelevant and inflammatory questions. For example, the State asked several defense witnesses if they were present while defendant was murdering the victim.

However, defendant objected only to the first of the questions of which he now complains and that objection was sustained. As to all of the subsequent questions, defendant failed both to object at the sentencing hearing and to include the issue in his post-sentencing motion. Therefore, the issue is waived. *Turner*, 128 Ill. 2d at 555. After reviewing the record, we further conclude that this issue does not warrant our consideration under the plain error doctrine. See, *e.g.*, *People v. Peeples*, 155 Ill. 2d 422, 495 (1993).

IV. State's Improper Closing Argument

Defendant next contends that he was denied a fair capital sentencing hearing because the State made two improper and prejudicial remarks during closing argument. The State referred to: defendant's killing again if his life were spared and if he were placed in the general prison population; and the victim's not receiving "a trial or appeal or lawyer to represent her." The record shows that defendant failed both to object to these remarks and to include this issue in his post-sentencing motion. The issue is, therefore, waived. *People v. Gilliam*, 172 Ill. 2d 484, 518 (1996); *Peeples*, 155 Ill. 2d at 495-96.

Defendant invokes the plain error rule. A reviewing court would normally consider waived any error related to comments to which no objections were made, unless the comments were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process. *People v. Sims*, 192 Ill. 2d 592, 636 (2000); *People v. Owens*, 102 Ill. 2d 88, 104 (1984). Considered in the context of the State's entire closing argument, these brief references did not deny defendant a fair sentencing hearing, or threaten deterioration of the judicial process. Consequently, we find no plain error. See *Sims*, 192 Ill. 2d at 637.

V. Court's Explanation of "Mercy"

During defense counsel's closing argument, the trial

court explained to the jury the role of "mercy" in a capital sentencing hearing. Defendant contends the court's explanation was confusing and misled the jury.

The defense and the prosecution debated this subject throughout the sentencing hearing. In his opening statement, defense counsel told the jury that defendant's troubled childhood began with the circumstances surrounding his birth. Counsel discussed how defendant was conceived by his mother being raped at age 12 and how defendant never had a father figure. Counsel related the difficult life and poor medical condition of defendant's mother. Counsel told the jury that, at the time of the sentencing hearing, defendant's mother was so ill that she could not visit defendant in prison; indeed, she rarely left her room. At this point in the defense opening statement, the State objected, asking: "What relevance does this have as to her testimony about the Defendant's childhood *** other than sympathy?" The trial court overruled the objection.

Later in his opening statement, defense counsel told the jury: "As you sit here and listen to the evidence, you can even consider mercy; mercy is a valid reason," at which point the trial court sustained the State's objection.

On several occasions throughout the sentencing hearing, outside the presence of the jury, the trial judge and both sides discussed at length the distinction between the concepts of "mercy" and "sympathy." For example:

> "THE COURT: I wanted to say something on the record. I have been reviewing those cases on the issue of mercy, and the *** courts have indicated mercy is, as they define it, an appropriate mitigating circumstance. I just want you to know I reviewed that and I know what the law is, and I am not saying this be the instruction or something, but to distill in my own mind, mercy is that kind of sympathy or compassion which may naturally arise from the evidence presented, particularly mitigation evidence. It

is not a characteristic that exists that they can consider existing independently of the evidence. \*\*\* It is not the same as mere sympathy or prejudice not based on the evidence; it is the natural feeling one may get from evidence, such as background, circumstances that are raised, that kind of thing.

\* \* \*

\*\*\* They are allowed to feel sorry for somebody because they grew up in terrible circumstances, but they are not allowed to ignore the evidence and just give him mercy out of nowhere, out of the goodness of their hearts they decide that is what they want to do."

During defense counsel's closing argument, this issue again arose:

"[Defense counsel]: A mitigating circumstance is a fact about the offense or about the Defendant which in fairness, even mercy—

[Prosecutor]: Again objection, Judge. Fairness and mercy are not interchangeable in this trial. That is the law. I object to that.

[Defense counsel]: Mercy is a mitigating factor.

THE COURT: As you define it.

\* \* \*

[Defense counsel]: \*\*\* And now I think it has come to the point where we are going to have to try to define mercy.

[Prosecutor]: I am going to object.

THE COURT: Listen to what he says.

[Defense counsel]: I feel that I am on a tightrope, but let me at least say this. Mercy is, no matter what it is, it is a relevant, mitigating factor. It is one of those any other reasons supported by the evidence. It is an option for you, and I know exactly—

[Prosecutor]: I am going to object that it is an option for them.

THE COURT: Sustained.

[Defense counsel]: It is something that you can take into account—

[Prosecutor]: Objection.

THE COURT: Overruled.

[Defense counsel]: —in terms of aggravation and mitigation, and the State is going to say why show him mercy; he didn't show any to [the victim]. Show him that we are better than him. We as a people, we as an institution, yes, show mercy to his mother.

[Prosecutor]: Objection.

THE COURT: Sustained.

[Prosecutor]: Ask that the jury be instructed to disregard those comments which were sustained.

[Defense counsel]: *** [I]s not mercy to the mother something within the mitigating factors that can be considered?

THE COURT: Mercy is, as defined in the case law, the part that says you can consider it, it's defined as that natural feeling of sympathy for something that may arise from certain evidence, like we all feel sympathetic to someone who was raped at 12 and had a child. That is a natural reaction. Feeling those kinds of feelings are appropriate to consider. Showing mercy is a different thing."

Defendant now contends that this explanation from the trial judge was inaccurate and confused the jury.

This issue reflects the contrary roles of "sympathy" and "mercy" in an Illinois capital sentencing hearing. These concepts are represented in the Illinois Pattern Jury Instructions, which the jury in this case received and of which defendant does not complain. Illinois Pattern Jury Instructions, Criminal, No. 7C.01 (3d ed. 1992) (hereafter IPI Criminal 3d) reads in part: "You are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." This court has repeatedly upheld the admonishment against sympathy in capital sentencing hearings. See, *e.g.*, *People v. Spreitzer*, 123 Ill. 2d 1, 41-43 (1988); *People v. Szabo*, 113 Ill. 2d 83, 95-96 (1986).

The jury also received IPI Criminal 3d No. 7C.06, which reads in part: "Mitigating factors include: *** Any other reason supported by the evidence why the defendant should not be sentenced to death." IPI Criminal 3d No. 7C.06. This court has repeatedly held that mercy is

one such "other reason." See, *e.g., People v. Buss,* 187 Ill. 2d 144, 234-35 (1999); *People v. Miller,* 173 Ill. 2d 167, 199 (1996).

This court has held that a reasonable juror, interpreting these instructions as a whole, would disregard the emotion of sympathy in general when sentencing a defendant, yet would consider the defendant's mitigation evidence and base the sentencing decision partly on the mitigation evidence "and any feelings of sympathy or mercy it elicited in that juror's heart or mind." *People v. Bean,* 137 Ill. 2d 65, 129 (1990); accord *People v. Brisbon,* 164 Ill. 2d 236, 254-56 (1995). In this case, the jury was free to consider defendant's relationship with his mother as a reason for not sentencing him to death. The admonishment against sympathy in no way diminished the impact of this mitigating evidence. See *People v. Franklin,* 135 Ill. 2d 78, 112-13 (1990).

Accordingly, to the extent that the trial court's explanation suggested to the jury that mercy differed from other mitigating factors, it was error. See *Buss,* 187 Ill. 2d at 244-45. As to the propriety of the trial court's oral explanation generally, we repeat the following:

> "Instructions found in IPI were drafted with the goal of sharply reducing the number of cases in which jury verdicts were set aside because of erroneous instructions. Consequently, each instruction was painstakingly drafted with the use of simple, brief and unslanted language so as to clearly and concisely state the law. To insure the use of such instructions, this court adopted Rule 451(a), which requires that an instruction in IPI be given where applicable, unless the court determines that the instruction does not accurately state the law. It is axiomatic, therefore, that the use of additional instructions on a subject already covered by IPI would defeat the goal that all instructions be simple, brief, impartial and free from argument." *People v. Haywood,* 82 Ill. 2d 540, 545 (1980).

In this case, however, the jury received proper written instructions. Therefore, any possible error relating to the

trial judge's prior, oral explanation was harmless. See *People v. Gacy*, 103 Ill. 2d 1, 98-100 (1984); accord *People v. Coulter*, 230 Ill. App. 3d 209, 217 (1992); *People v. Gray*, 215 Ill. App. 3d 1039, 1052 (1991).

## VI. Allocution

Defendant next contends that the trial court erred in not allowing him to read a statement to the jury in allocution. There is no statutory or constitutional right to allocution in a capital sentencing hearing. *People v. Simms*, 192 Ill. 2d 348, 416 (2000); *People v. Gilliam*, 172 Ill. 2d 484, 519 (1996).

Defendant recognizes this holding, but notes the State's argument that he expressed no remorse for murdering the victim. Defendant refers to his proffered allocution statement, in which he said: "To my victims, near or far, I've only had the opportunity to mention the following in prayer, But THANKS to Your Honor, I can say: PLEASE FORGIVE ME." Defendant is correct that "[t]he Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.' [Citation.]" *Simmons v. South Carolina*, 512 U.S. 154, 161, 129 L. Ed. 2d 133, 141, 114 S. Ct. 2187, 2192-93 (1994) (opinion of Blackmun, J., joined by Stevens, Souter, and Ginsburg, JJ.); accord *Baze v. Commonwealth*, 965 S.W.2d 817, 821 (Ky. 1997); *State v. Borders*, 255 Kan. 871, 886, 879 P.2d 620, 631 (1994) (and cases cited therein). Defendant now argues that the State denied him due process by arguing his lack of remorse when he was not allowed to respond.

We cannot accept this argument. Defendant, of course, could have testified at the capital sentencing hearing, under oath and subject to reasonable cross-examination. However, he could not have spoken other than as a witness. See *People v. Gaines*, 88 Ill. 2d 342, 376 (1981). In a written motion to make an allocution statement, defendant acknowledged that he would be

subject to cross-examination if he testified; therefore, according to his motion, he sought to "present mitigation" through allocution. However, defendant had no right to address the jury without being under oath and subject to cross-examination. See *People v. Perez*, 108 Ill. 2d 70, 89 (1985).

VII. Remand for Psychotropic Medication Hearing

Defendant next contends that this case should be remanded to the trial court for a determination of whether he was taking a "psychotropic-type" drug at his original trial. His original trial counsel sought a fitness determination based on defendant's failure to cooperate. Defendant was examined by a psychiatrist and, in October 1983, had a fitness hearing. The trial court found that defendant was fit to stand trial.

However, defendant now points to an April 1984 presentence report, which states, in pertinent part, that defendant "had 3 psychiatric contacts in 1983 *** and one resulting in medication (Dalmane) being prescribed as reported by the casework supervisor." Defendant notes, *inter alia*, that Dalmane is a "hypnotic agent" used to treat insomnia; and that Dalmane has caused side effects that include disorientation, confusion, and irritability. Physician's Desk Reference 2520-21 (52d ed. 1998).

Defendant concedes that the above-quoted sentence in the presentence report is the *only* reference in the record, which includes the psychiatric report prepared for the fitness hearing, to any prescribed medication. However, based on the reference to Dalmane, defendant reasons that it is unknown when, how much, for how long—and we add, even if—Dalmane was administered to him. Citing *People v. Kinkead*, 168 Ill. 2d 394, 414-15 (1995), defendant requests that we order a limited remand so that the trial court may expeditiously determine these matters.

The State, however, contends that we are precluded

from reaching the merits of this issue due to lack of jurisdiction. The United States Court of Appeals for the Seventh Circuit concluded that defendant was "entitled to a writ of habeas corpus *limited to his sentence.*" (Emphasis added.) *Hall,* 106 F.3d at 744. The court of appeals remanded the cause to the federal district court "for the issuance of a writ of habeas corpus *requiring a new sentencing hearing.*" (Emphasis added.) *Hall,* 106 F.3d at 753. The State invokes the mandate rule, *i.e.,* "when a reviewing court issues a mandate, it vests the trial court with jurisdiction to take only such action as conforms to that mandate. [Citations.] Any other order issued by the trial court is outside the scope of its authority and void for lack of jurisdiction." *People ex rel. Daley v. Schreier,* 92 Ill. 2d 271, 276-77 (1982). Therefore, the State now argues: "Because the Seventh Circuit ordered a remand solely for a new sentencing hearing, the trial court could not properly consider an issue that is completely unrelated to sentencing. It follows that the matter is not properly before this Court, either."

We reject this contention. Pursuant to the mandate of the court of appeals, the federal district court granted defendant's *habeas corpus* petition to the extent set forth in the appellate opinion, and ordered the Illinois Department of Corrections to release defendant if he was not given a new sentencing hearing within 120 days of its order. This "conditional release" order, in its "retry or release" form, is the most common federal *habeas corpus* remedy today. See generally 2 J. Liebman & R. Hertz, Federal Habeas Corpus Practice & Procedure § 33.3 (3d ed. 1998). "Apart from regulating the time during which the retrial or other proceeding is to take place *** federal courts generally exercise little authority by means of conditional release orders to supervise or control the precise procedures utilized at any subsequent state court proceedings." 2 J. Liebman & R. Hertz, Federal Habeas

Corpus Practice & Procedure § 33.3, at 1379-80 (3d ed. 1998). The mandate of the federal district court did not preclude the trial court from conducting the determination that defendant requests.

However, the fact that the federal mandate does not control the jurisdiction of Illinois courts does not mean that state law authorizes defendant to raise this claim now. The sentencing hearing at issue in this case clearly was not affected by the alleged 1983 ingestion of Dalmane, and defendant, of course, does not claim that it was. Thus, any error with respect to this issue goes to the guilt-innocence phase of the original proceedings, *i.e.*, defendant's underlying convictions themselves. This appeal, however, is not the proper vehicle in which to raise such an argument. It is axiomatic that in an appeal from a contested proceeding, the only errors at issue are those errors which occurred at that proceeding. The case upon which defendant relies, *People v. Kinkead*, 168 Ill. 2d 394 (1995), does not support raising such an argument in this procedural context. For these reasons, we will not address this argument in this appeal and, accordingly, express no opinion on whether the claim is procedurally defaulted or meritorious.

VIII. Constitutionality of Death Penalty Statute

Defendant lastly contends that the Illinois death penalty statute is unconstitutional (U.S. Const., amends. VIII, XIV; Ill. Const. 1970, art. I, §§ 2, 11) for three reasons. He argues that the statute is unconstitutional because: (1) innocent persons will inevitably be executed; (2) the statute places a burden of proof on the defendant that precludes meaningful consideration of mitigating evidence and allows the sentencer to weigh a vague aggravating factor; and (3) the statute does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. This court has repeatedly rejected these contentions. *People v. McCallister*, 193 Ill. 2d 63, 114

(2000); *People v. Nieves*, 192 Ill. 2d 487, 504 (2000); *Williams*, 192 Ill. 2d at 590. We decline to revisit these holdings.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of McLean County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, March 13, 2001, as the date on which the sentence of death entered in the circuit court is to be imposed. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1998). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE BILANDIC, specially concurring:

I agree that defendant's murder conviction and death sentence should be affirmed. Therefore, I join the majority opinion. I write separately, however, as to issue VII, which involves defendant's fitness for trial while under medication, in order to express the continued adherence to *People v. Mitchell*, 189 Ill. 2d 312 (2000). In *Mitchell*, we held that a defendant's claim that he was denied due process when he did not receive a fitness hearing, although he was taking psychotropic medication, is not cognizable on post-conviction review.

Here, defendant cites to a 1984 presentence report that was introduced at his original sentencing hearing 16 years ago. The report indicates that, as the result of a 1983 "psychiatric contact[ ]," defendant was prescribed Dalmane. Defendant argues that this cause should be remanded to the trial court for a hearing to determine whether he was being treated with Dalmane during the time of his trial and, if so, to determine also the dosage

of the drug he received and the dates of treatment. Defendant characterizes Dalmane as a "psychotropic-type" medication.[1]

Defendant did not raise the issue of his fitness for trial in his direct appeal. See *People v. Hall*, 114 Ill. 2d 376 (1986). Moreover, defendant did not raise the issue in post-conviction proceedings (see *People v. Hall*, 157 Ill. 2d 324 (1993)); he did not raise the issue in his *habeas corpus* petition (see *United States ex rel. Hall v. Washington*, 916 F. Supp. 1411 (C.D. Ill. 1996)); and he did not raise it on review of the denial of his *habeas corpus* petition (see *Hall v. Washington*, 106 F.3d 742 (7th Cir. 1997)).

On review of the denial of defendant's *habeas corpus* petition, the Seventh Circuit Court of Appeals granted defendant a new sentencing hearing on the basis that counsel was ineffective at defendant's capital sentencing hearing for failing to present mitigating evidence and for failing to make an appropriate closing argument. *Hall*, 106 F.3d at 748-49. Defendant received a second sentencing hearing and was again sentenced to death. Now, on direct review of his second sentencing hearing, defendant, for the first time, raises the issue of his fitness for trial. Under *Mitchell*, defendant's argument in this case would have been barred numerous proceedings ago.

To the extent the majority opinion, by evading the issue, impliedly suggests that a procedural vehicle exists in which defendant may raise his claim, I disagree. Under *Mitchell*, defendant's claim is barred.

---

[1]Although defendant refers to Dalmane as a "psychotropic-type" or a "psychotropic-like" medication, defendant does not argue that Dalmane fits within the definition of psychotropic medications adopted by this court. See *Mitchell*, 189 Ill. 2d at 323-24. Dalmane, which is used to treat insomnia, is classified among the "Sedatives & Hypnotics," and not among the "Psychotherapeutic Agents." See Physician's Desk Reference 214, 216, 2520 (52d ed. 1998).

JUSTICES MILLER, HEIPLE and RATHJE join in this special concurrence.

CHIEF JUSTICE HARRISON, dissenting:
Hall's death sentence cannot be allowed to stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Hall's sentence of death should therefore be vacated, and the cause should be remanded to the circuit court for imposition of a sentence of imprisonment. Ill. Rev. Stat. 1983, ch. 38, par. 9—1(j).