2018 IL App (3d) 160599

Opinion filed April 3, 2018

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
|---|---|---|
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-16-0599 Circuit No. 15-CF-2656 |
| MATTHEW HABERKORN, | ) ) | Honorable Sarah Jones, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Presiding Justice Carter and Justice McDade concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant, Matthew Haberkorn, appeals from his conviction and sentence for unlawful presence at a facility providing services exclusively directed toward children by a child sex offender (720 ILCS 5/11-9.3(c) (West 2014)). Specifically, he argues that (1) the State's evidence failed to prove him guilty and (2) the trial court erred in denying his posttrial motion based on a defective indictment. We reverse.

¶ 2                                          FACTS

¶ 3 In July 2008, defendant, then a 17-year-old high school student, pled guilty to criminal sexual abuse, a Class A misdemeanor, after he and his 15-year-old high school girlfriend had sex

(720 ILCS 5/12-15(c) (West 2006)). As a result of that conviction, defendant is required to register as a sex offender under the Sex Offender Registration Act (SORA) (730 ILCS 150/3 (West 2014)).

¶ 4      Eight years later, defendant accompanied his cousin and her three children onto a bus chartered by Easter Seals. A parent on the bus recognized defendant as a sex offender. Immediately thereafter, an Easter Seals employee asked defendant to exit the bus, which he did without incident.

¶ 5      In January 2016, the Will County State's Attorney charged defendant by criminal indictment with unlawful presence at a facility providing services exclusively directed toward children (720 ILCS 5/11-9.3(c) (West 2014)). Specifically, the indictment alleged that on or about November 4, 2015, "defendant, a child sex offender, was knowingly present on a school bus chartered by a facility providing programs or services exclusively directed toward persons under the age of 18, namely Easter Seals, while children were present on said school bus."

¶ 6      Defendant's bench trial commenced in July 2016. At trial, the parties stipulated to a number of facts, including that (1) defendant was a registered sex offender having been convicted of criminal sexual abuse, a Class A misdemeanor, in 2008; (2) on November 4, 2015, Easter Seals chartered a bus as part of its Jump Start program to take a group of parents and children on a field trip to the Ball Factory in Naperville; (3) approximately 20 children and their 20 parents as well as parent educators for the program were on the bus; (4) defendant was on the bus with his cousin, who was enrolled in the program, and her three children; (5) the bus picked up defendant at Walmart in Joliet; (6) a parent on the bus recognized defendant as being a sex offender and notified one of the parent educators; and (7) Easter Seals' personnel asked defendant to exit the bus, which he did without incident.

¶ 7                                    I. The State's Evidence

¶ 8          Dana Christian, a parent educator with Easter Seals for 4½ years, testified for the State as follows. Easter Seals is a national organization that "provide[s] different services for people with disabilities." It offers services for adults, including an adult day services program, a residential home for adults with disabilities, and support groups for parents that have autistic children.

¶ 9          Easter Seals' Jump Start program is a parent-enrichment program that focuses on "helping parents be better parents." It "provide[s] parental support to families that *** have children up to the age of three or [are] pregnant." The goals of the program include strengthening parent/child relationships, reinforcing parenting skills, and teaching parents how to manage the stress of parenting. The program also works with parents suspected of child abuse and parents involved with the correctional system. The program offers no classes for children and is not a school.

¶ 10         On November 4, 2015, Easter Seals chartered two buses for a field trip to the Ball Factory in Naperville as part of its Jump Start program. The event was "for the families and the children." The buses picked up families in the Walmart parking lot in Joliet. Shortly after the passengers boarded, one of the parents informed Christian that a sex offender, whom she identified as defendant, was on the bus. Defendant exited the bus upon being asked to do so.

¶ 11         On cross-examination, the following colloquy occurred:

                   "Q. Would you agree with me that Jump Start is a parent

              enrichment program?

                   A. Yes.

                   Q. And the focus of Jump Start is the parents, correct?

                   A. Is the family.

Q. Is the family, and helping parents be better parents?

A. Yes.

* * *

Q. So by helping the family—by helping the children, you try to help the parents, and the title, parent educator, captures the essence of the program, correct?

A. Yes.

Q. And the goal of the program is to strengthen parent/child relationships, correct?

A. Correct.

Q. Reinforce parenting skills, correct?

A. Correct.

Q. And one of the things that the program teaches is how to help parents manage with stress—manage the stress of parenting, correct?

A. Correct.

* * *

Q. And another aspect of the program are what is known as group-parent meetings, correct?

A. Correct.

Q. And those programs are for parents, that's where the parents meet, right?

* * *

A. Yes.

* * *

Q. [In addition to group-parent meetings], there are field trips that foster good will, correct?

A. Yes.

Q. And the visit to the Ball Factory is what you described as a field trip that fosters good will?

A. Yes.

* * *

Q. And just so we are real clear, one does not have to be under the age of 18 to participate in a Jump Start program, correct?

A. Correct.

Q. And Jump Start is not exclusively geared to children under the age of 18, correct?

A. Correct.

Q. Excuse me?

A. Correct.

* * *

Q. Jump Start is involved with grandparents?

A. Yes.

Q. And Jump Start is also involved with parents of disabilities [*sic*]?

A. Yes.

5

Q. Jump Start does not offer any classes for children, correct?

A. Correct.

Q. Jump Start is not a school?

A. Correct.

Q. There are no classes of children in 12th grade or under for children that Jump Start offers, correct?

A. Correct.

Q. And because it offers no classes, it's not a class or a school where children in 12th grade or under are enrolled, correct?

A. Correct."

¶ 12    On redirect-examination, the following discussion occurred:

"Q. And what is the Ball Factory?

A. It is a family-based activity center.

Q. Would you consider it geared towards children?

A. Yes."

¶ 13    On recross-examination, the following dialogue occurred:

"Q. You had parents and children on the bus, correct?

A. Yes.

Q. This visit was not directed exclusively to the children, correct?

A. Correct."

¶ 14    Thereafter, the State rested. The trial court denied defense counsel's motion for a directed verdict.

¶ 15                          II. Defense Evidence

¶ 16    Debra Condotti, the president and chief executive officer (CEO) for the Joliet region of Easter Seals, testified that Easter Seals provides services for adults, including adult day services, long-term care for adults with intellectual disabilities, caregiver support services, parent-training programs, support services to parents or children with disabilities, and services for veterans. The following dialogue then occurred:

> "Q. I want to turn your attention to the Jump Start program for a moment. Is that one of the programs that is run out of the Easter Seals in Joliet?
>
> A. Yes.
>
> Q. Okay. And you understand that the field trip that Mr. Haberkorn, my client went on, was part of the Jump Start program, is that right?
>
> A. That's correct.
>
> Q. Okay. So, can you explain for us what the Jump Start program is?
>
> A. It's a service to parents who are in vulnerable environmental circumstances and have young children. So, it's the intention of the program to provide support and training to the parents and to network the family, including the child and the entire family with available resources in the community to sustain

7

the family unit and to prepare, you know, the children to do well in school.

Q. Is it correct to say that there are programs that are part of the Jump Start initiative that are directed exclusively towards parents?

A. Yes.

Q. And would it be correct to say that there are some programs that are part of the Jump Start initiative where parents and children are involved, correct?

A. Yes.

Q. Would it be correct to say that there are no programs that are part of the Jump Start initiative that are exclusively for children?

A. Yes.

* * *

Q. What I am asking is, Easter Seals, as an organization, are its services only for children, or does it have services for groups, other than just children?

A. The organization serves children and adults with disabilities, those with special needs and their families. There are programming—there is programming that we provide that is geared towards children services. There is programming that we provide that are geared towards adults [*sic*] services, and there is

8

programming that's provided that's geared towards the entire family.

\* \* \*

Q. And the Jump Start program, does the Jump Start program provide services only to children?

A. No."

¶ 17        Christine Sparks, the Jump Start program coordinator, testified that the Jump Start program is a "parenting enrichment program" that offers parent education and family support services. Grandparents, foster parents, and soon-to-be parents may also participate in the program. Some of the activities offered in the program are exclusively for parents and some are for families, but none are exclusively for children. The following colloquy then occurred:

"Q. I want to ask you about the trip that day, I want to get some of the context of the Jump Start program and put into context of the field trip on November 4th. The November 4th trip was part of this initiative, correct?

A. Correct.

Q. Okay. Is it fair to say that this was not a trip where parents are dropping off their kids and then heading home?

A. Correct.

Q. And instead, this is a program on November 4th, where the parents are coming specifically with their children?

A. Yes.

Q. And is that because that event on that day is part of the curriculum of helping teach parents and educate parents?

A. Yes.

Q. Is it fair to say that field trip like this have about as many parents as there are children?

A. Yes.

Q. Now, I think you mentioned this before, but in addition to the parents who are there with their children, there are also a number of Easter Seals staff, parent educators, correct?

A. Correct.

* * *

Q. We have talked about the Jump Start program and its role as a parent education program, and I want to be clear, is Jump Start a nursery school?

A. No.

Q. Is Jump Start a daycare center?

A. No.

Q. Is Jump Start a daycare program of any kind?

A. No.

* * *

Q. So, the trip on November 4th, 2015, was that trip limited to parents or children who are enrolled in any particular school or nursery school?

10

A. No.

Q. Was the trip affiliated with any particular school?

A. No.

Q. Is the Jump Start program affiliated with any particular school?

A. No.

Q. Last question. Would it be fair to say that the Jump Start program does not provide services exclusively for children?

A. Correct."

¶ 18                    III. The Judgment and Sentence

¶ 19    Based on the above evidence, the trial court found defendant guilty of the charged offense and sentenced him to 24 months' probation, plus fines and costs.

¶ 20    Defendant appeals.

¶ 21                    ANALYSIS

¶ 22    Defendant argues that (1) the State's evidence failed to prove him guilty and (2) the trial court erred in denying his posttrial motion based on a defective indictment.

¶ 23             I. Exclusivity Requirement and Sufficiency of the Evidence

¶ 24    Defendant's primary contention on appeal is twofold. First, he argues that the trial court failed to strictly construe the statute's exclusivity requirement. Second, he asserts that based on a proper interpretation of the exclusivity requirement, the evidence failed to support his conviction.

¶ 25    Before we consider the merits of defendant's claim, we must first resolve a dispute between the parties regarding the appropriate standard of review. Defendant asserts that a *de novo* standard of review is proper because no facts are in dispute and the ultimate issue

involves a question of statutory interpretation. See *People v. Hall*, 195 Ill. 2d 1, 21 (2000). On the other hand, the State maintains that the crux of defendant's claims revolve around factual questions that should be reviewed under the traditional standard of review in cases concerning the sufficiency of the evidence, which is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. See *People v. Collins*, 106 Ill. 2d 237, 261 (1985). We find the issue here revolves around the construction of a statute, and thus, our review is *de novo*. However, defendant's conviction cannot stand under even a deferential standard of review as no rational trier of fact could have found that the State proved the elements of the charged offense.

¶ 26    The primary objective of statutory interpretation is to ascertain and give effect to the intent of the legislature. *People v. Perry*, 224 Ill. 2d 312, 323 (2007). The plain language of the statute is the best indication of the legislature's intent. *People v. Christopherson*, 231 Ill. 2d 449, 454 (2008). "In determining the plain meaning of statutory terms, we consider the statute in its entirety, keeping in mind the subject it addresses and the apparent intent of the legislature in enacting it. [Citation.] Where the language of the statute is clear and unambiguous, we must apply it as written, without resort to extrinsic aids to statutory construction." (Internal quotation marks omitted.) *People v. Giraud*, 2012 IL 113116, ¶ 6. "This court will not depart from the statute's plain language by reading in exceptions, limitations, or conditions in conflict with the legislature's intent." *In re Detention of Hardin*, 238 Ill. 2d 33, 40 (2010).

¶ 27    The State charged defendant under section 11-9.3(c) of the Criminal Code of 2012. That section provides, in relevant part:

> "It is unlawful for a child sex offender to knowingly operate,
> manage, be employed by, volunteer at, be associated with, or

12

knowingly be present at any: (i) facility providing programs or services *exclusively directed toward persons under the age of 18*; (ii) day care center; (iii) part day child care facility; (iv) child care institution; (v) school providing before and after school programs for children ***." (Emphasis added.) 720 ILCS 5/11-9.3(c) (West 2014)).

The issue before us revolves around the term "exclusively" as it used in the statute.

¶ 28 Defendant notes that the term "exclusively" is defined as "apart from all others," "solely," and "to the exclusion of all others." See Oxford Online Dictionary, https://en.oxforddictionaries.com/definition/us/exclusively (last visited Feb. 28, 2018). Defendant then points to the evidence presented at trial, which established that Easter Seals is not a facility that provides programs or services *exclusively* directed toward persons under the age of 18. In fact, the record shows that the majority of services provided by Easter Seals are directed toward adults and the Jump Start program at issue here is a parent enrichment program offering support, training, and networking for parents, grandparents, and parents-to-be.

¶ 29 The State concedes that neither Easter Seals nor the Jump Start program, in particular, are directed exclusively toward children. The State maintains, however, "that the bus in question heading to the Ball Factory on November 4, 2015[,] was a facility providing a service exclusively directed toward persons under the age of 18."

¶ 30 The first problem with the State's argument is that it is clearly rebutted by the record; even the State's witness rebutted this allegation. Indeed, the statute itself specifically excludes a sex offender's presence at a day care center, part day child care facility, child care institution, or a school providing before and after school programs for children. See 720 ILCS 5/11-9.3(c)

13

(West 2014). In other words, the statute excludes a convicted sex offender from being present at a facility whose services are directed *solely* toward children. Had the legislature intended to exclude convicted sex offenders from a facility providing services directed toward children and adults, it would have omitted the term "exclusively." It did not.

¶ 31 The statute under which the State charged defendant does not attempt to prohibit convicted sex offenders from being present at venues where children together with their parents congregate. Pursuant to the plain meaning of the statute, the State must prove that defendant was knowingly present at a facility providing programs or services exclusively directed toward children. The State did not come close.

¶ 32 The State offered absolutely no evidence that defendant violated the statute. The evidence shows that neither Easter Seals, nor the Jump Start program, nor the bus transporting the group to the Ball Factory are facilities providing programs or services exclusively directed toward children. Further, the State's assertion that the Ball Factory is the type of place exclusively directed toward children, even if true, is irrelevant. Defendant never arrived at the Ball Factory. Thus, the State cannot and did not prove beyond a reasonable doubt that defendant was knowingly present at a facility providing programs or services exclusively directed toward children. Accordingly, we reverse defendant's conviction and sentence.

¶ 33 We note in passing that it seems unlikely that the legislature either intended or anticipated that prosecutors would use this statute to bird-dog those similarly situated with this defendant. Perhaps it is time to rethink lumping high school sweethearts together with dangerous child predators. Illinois law provides that "[a] person commits criminal sexual abuse if that person is

14

under 17 years of age and commits an act of sexual penetration or *sexual conduct* with a victim who is at least 9 years of age but under 17 years of age." (Emphasis added.) *Id.* § 11-1.50(b).[1]

¶ 34        Illinois defines "sexual conduct" as "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, *** for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* § 11-0.1.

¶ 35        So, we have it that two 16-year-old high school kids involved in even a moderately heavy petting session most likely both violate the statute and are both guilty of criminal sexual abuse, a Class A misdemeanor. That seems contrary to anything that even resembles common sense. But, that is not the worst of it. As exhibited by this case, these kids are now not just criminals but "child sex offenders" under the law and can be hounded for years at the whim of prosecutors, à la Victor Hugo. The sex offender registration is mandatory (730 ILCS 150/3 (West 2014)). Who thinks this is a good idea? It seems that one reasonable alternative is to make sex offender registration discretionary. This would at least present the possibility of injecting some common sense into the equation. Under the current registration, two underage adolescents who fail to resist the mutual call of their hormones are lumped together as "child sex offenders" with those who violently rape children. Perhaps the legislature depended upon prosecutorial discretion. We find this case to be the poster child exhibiting that the law should not rely upon reasonable exercise of a prosecutor's discretion. There are child sex offenders and then there are child sex offenders. We suggest that a one-size-fits-all approach to dealing with those who have sexual contact with minors is oppressive and contrary to accepted notions of crime and punishment. While two young people who willingly have sexual contact with each other are, as explained

[1]We realize that this defendant was 17 when he had a "consensual" sexual relationship or encounter with his 15-year-old high school classmate. We use this as an illustration that the law allows results even more absurd than the one before us.

15

above, guilty of a Class A misdemeanor, they are nonetheless categorized as "child sex offenders" and subject to the same SORA restrictions as those who prey on children. We submit that there are reasonable ways in which the statutory scheme can be amended to make it more reasonable. One is to eliminate any SORA restrictions for misdemeanor offenders. Another is to make any registration discretionary.

¶ 36                                    II. Motion in Arrest of Judgment

¶ 37        Because we reverse defendant's conviction and sentence, we need not address whether his motion in arrest of judgment should have been granted due to a defective indictment.

¶ 38                                           CONCLUSION

¶ 39        For the foregoing reasons, we reverse the judgment of the circuit court of Will County.

¶ 40        Reversed.